RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0125p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

―――――――――――

JOHN MOODY; DONALD HARMON; RICK RAY;
WALLY MCILLMURRAY,

*Plaintiffs-Appellants*,

    *v.*

MICHIGAN GAMING CONTROL BOARD; RICHARD
KALM; GARY POST; DARYL PARKER; RICHARD
GARRISON; BILLY LEE WILLIAMS; JOHN LESSNAU;
AL ERNST; MICHIGAN DEPARTMENT OF ATTORNEY
GENERAL, Criminal Division,

               *Defendants-Appellees*.

No. 14-1511

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 4:12-cv-13593—Gershwin A. Drain, District Judge.

Argued: March 11, 2015

Decided and Filed: June 16, 2015

Before: KEITH, MERRITT, and BOGGS, Circuit Judges.

―――――――――――

#### COUNSEL

**ARGUED:** Hugh M. Davis, CONSTITUTIONAL LITIGATION ASSOCIATES, P.C., Detroit, Michigan, for Appellants. Jason A. Geissler, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees. **ON BRIEF:** Hugh M. Davis, CONSTITUTIONAL LITIGATION ASSOCIATES, P.C., Detroit, Michigan, for Appellants. Jason A. Geissler, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees.

---

**OPINION**

---

BOGGS, Circuit Judge.   The Michigan Gaming Control Board (MGCB)[1] regulates harness racing, a form of horse racing, in Michigan.  In the course of investigating allegations of illegal race-fixing, Michigan horse-racing stewards asked Plaintiffs-Appellants John Moody, Donald Harmon, Rick Ray, and Wally McIlmurray, Jr. (harness drivers) questions that the harness drivers construed as possibly self-incriminating.  Invoking the Fifth Amendment to the Constitution, the harness drivers refused to answer.  Because of this refusal, the MGCB suspended the harness drivers' licenses to race and excluded them from horse-racing grounds. The harness drivers, in addition to seeking relief in state court and administrative fora, sued the MGCB and its employees in federal district court.  That court granted summary judgment to the MGCB.  The harness drivers timely appealed.  We affirm the district court's judgment in part, reverse in part, and remand for further proceedings.

**I**

In 2010, the MGCB received an anonymous tip that certain harness-racing drivers were fixing races in concert with certain known gamblers.  On May 19, 2010, Michigan State Police Detective Thomas DeClercq informed the harness drivers' then-attorney that the harness drivers would be arrested, criminally charged, and arraigned following an informal investigative hearing that had earlier been scheduled for May 20.  At that hearing, the harness drivers asserted their Fifth Amendment right against self-incrimination and refused to answer questions.   The following day,[2] the state suspended the plaintiffs' 2010 licenses to work in horse racing because they failed "to comply with the conditions precedent for occupational licensing in Michigan as outlined in R431.1035."[3]   Rule 431.1035 provides, in part, "[t]hat the applicant [for an

---

[1]Defendants-Appellees in addition to the Michigan Gaming Control Board include various state employees. We refer to the defendants-appellees collectively as "the MGCB."

[2]The district court suggested that the administrative ruling was issued on May 20, not May 21.

[3]Although each state and Canadian province regulates horse racing separately, the regulators have reciprocity agreements.  Thus, the effect of these suspensions was to suspend plaintiffs from working in horse racing anywhere in the United States or Canada.

occupational license, such as the license to race horses] . . . shall cooperate in every way . . . during the conduct of an investigation . . . ." On May 26, the harness drivers appealed their suspensions administratively. The harness drivers subsequently filed a suit for injunctive relief in Wayne County Circuit Court. The MGCB delayed the administrative appeal pending the state-court ruling.[4]

On November 30, 2010, the MGCB issued "orders of exclusion" as to each harness driver. The MGCB took the position that it would not lift the exclusion orders unless the plaintiffs answered questions without legal representation. The harness drivers applied for 2011, 2012, and 2013 licenses without success. In response to the harness drivers' letters that sought to appeal "the deni[a]l of 2011 occupational license," the MGCB indicated that the exclusion orders precluded their *consideration* of the harness drivers' applications. Letter from Alexander Ernst, Horse Racing Manager, to John R. Moody (Nov. 16, 2011) (Ernst Letter).

In August 2012, the harness drivers filed this suit under 42 U.S.C. § 1983, seeking damages, costs, fees, and injunctive and declaratory relief. On November 27, 2013, the district court granted the MGCB's motion for summary judgment and denied the harness drivers' motion for partial summary judgment. The district court held that the Eleventh Amendment barred plaintiffs' claims for money damages against MGCB and its officials. And the district court held that the MGCB was entitled to qualified immunity because the harness drivers failed to identify the violation of a constitutional right.[5] The harness drivers timely appealed.[6]

"On appeal, this court reviews the district court's grant of summary judgment de novo." *T-Mobile Cent. LLC v. Charter Twp. of W. Bloomfield*, 691 F.3d 794, 798 (6th Cir. 2012). Qualified immunity involves a two-step inquiry. *Brown v. Lewis*, 779 F.3d 401, 417 (6th Cir.

---

[4]The Wayne County Circuit Court heard and decided the case. On appeal, the Michigan Court of Appeals ultimately did not consider the case until after the plaintiffs' 2010 licenses had expired, and so dismissed the case as moot. The MGCB claims that, despite its repeated inquiries, the harness drivers only confirmed on November 27, 2012, their wish to proceed with their administrative appeal.

[5]After their 2014 license applications were not accepted, plaintiffs filed a mandamus action in state court. *Moody v. Mich. Gaming Control Bd.* (Ingham Cnty. Cir. Ct.) (No. 14-159-AW). The court did not grant preliminary injunctive relief. Thereafter, defendants processed plaintiffs' applications. By June 2014, plaintiffs were relicensed.

[6]Defendants argue that the plaintiffs have abandoned their claims for monetary relief. But plaintiffs appealed the district court's determination that defendants did not violate their constitutional rights. *See* Reply Br. 8 ("Appellants' appeal squarely challenges the trial court's erroneous conclusion that Appellees did not violate their constitutional rights."). So they "made no . . . concession as to any qualified immunity the individual Appellees claim protects them in their individual capacities . . . ." *Id.* at 7.

2015).  We must determine whether the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred and whether the violation involved a clearly established constitutional right of which a reasonable person would have known.  *See id.* at 411. We may address these steps in either order.  *Pearson v. Callahan*, 555 U.S. 223, 227 (2009).[7]

We consider five actions that may have violated the harness drivers' rights: (1) suspension of license because of refusal to self-incriminate without immunity, (2) exclusion from horse racing for same reason, (3) suspension without hearing, (4) exclusion without hearing, and (5) retaliation.

On the self-incrimination claims, we reverse the district court's grant of summary judgment.  Based on the applicable law, the facts viewed in the light most favorable to the harness drivers show that the Constitution entitled the harness drivers to refuse to answer potentially self-incriminating questions, unless the state immunized them from prosecution.  To punish the drivers violated the Constitution, and both suspension and exclusion constitute punishment.  So the MGCB violated the harness drivers' constitutional rights against self-incrimination.  Whether these rights were clearly established at the time remains a question.  We remand the case for further proceedings.  *Cf. Dominque v. Telb*, 831 F.2d 673, 677 (6th Cir. 1987).

The harness drivers were due hearings on their suspensions and their exclusions.  As we explain below, they were granted due process on their suspensions.  We affirm the judgment of the district court on the due-process claim concerning suspensions.  The harness drivers were not granted due process on their exclusions.  But, for reasons explained below, the absence of that process may have resulted from the harness drivers' own failure to act.  We reverse the grant of summary judgment on the due-process claims concerning exclusions and remand for further relevant proceedings.

Finally, the retaliation claims are not properly before us.

---

[7]In our qualified-immunity analysis, we had required plaintiffs to demonstrate the governments' objective unreasonableness.  *See, e.g.*, *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003).  After *Pearson v. Callahan*, 555 U.S. 223 (2009), we consider reasonableness during our evaluation of the two qualified-immunity factors. *See Brown v. Lewis*, 779 F.3d 401, 417 (6th Cir. 2015).

## II

### A

The privilege against self-incrimination applies more broadly than the bare text of the Fifth Amendment might suggest.  A few examples demonstrate the privilege's practical reach. The privilege against self-incrimination applies in civil as well as criminal proceedings.  *Malloy v. Hogan*, 378 U.S. 1, 11 (1964); *see also Fieger v. U.S. Att'y Gen.*, 542 F.3d 1111, 1120 (6th Cir. 2008) (observing that "the fulcrum of the Fifth Amendment privilege is the potential for self-incrimination, not the nature of the instant proceeding" (citing *Bialek v. Mukasey*, 529 F.3d 1267, 1272 (10th Cir. 2008))).  It protects against the use in prosecution of police officers of incriminating statements that they made when given the choice "to forfeit their jobs or to incriminate themselves."  *Garrity v. New Jersey*, 385 U.S. 493, 497 (1967).

When the questioned persons make the inverse choice under the same sort of duress, i.e., they prefer to forfeit their jobs rather than incriminate themselves, the privilege protects them. *Cf. id.* at 498; *Union Pac. R.R. Co. v. Pub. Serv. Comm'n*, 248 U.S. 67, 70 (1918).  It is "clearly established . . . that public employers may not coerce their employees to abdicate their constitutional rights on pain of dismissal . . . ."  *Clemente v. Valso*, 679 F.3d 482, 492 (6th Cir. 2012); *see also Spevack v. Klein*, 385 U.S. 511 (1967) (holding that the privilege protects a lawyer who refuses to give testimony that might incriminate himself); *Gardner v. Broderick*, 392 U.S. 273 (1968) (police officer); *Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation*, 392 U.S. 284 (1968) (public sanitation employees); *Slochower v. Bd. of Educ.*, 350 U.S. 551 (1956) (public-school teacher).  These cases "stan[d] for the proposition that a governmental body may not require an employee to waive his privilege against self-incrimination as a condition to keeping his job . . . even [when] no criminal proceedings were ever instituted against" an employee who was later successful in constitutional claims.  *Lingler v. Fechko*, 312 F.3d 237, 239 (6th Cir. 2002) (citations omitted).

Nor does the privilege protect only state employees.  It protects a contractor, such as an architect, against the cancellation of state contracts and disqualification from receiving subsequent contracts.  *Lefkowitz v. Turley*, 414 U.S. 103 (1973).  It protects from dismissal from

his position a political-party officer in the same situation. *Lefkowitz v. Cunningham*, 431 U.S. 801 (1977).**[8]**

Here, the MGCB did not offer the harness drivers—state licensees—immunity before the hearing on May 20, 2010. So the harness drivers had reason to fear that, had they responded to questions during the 2010 hearing with incriminating answers, prosecutors would use those answers as evidence, although a court would have been unlikely to admit those answers, given the law laid out in *Garrity* and its sequellae. In this situation, the Constitution entitled the harness drivers to assert the privilege against self-incrimination and thus to refuse to answer the MGCB's questions. To ban them from horse racing for refusing to answer was exactly the sort of "grave consequence solely because [t]he[y] refused to waive immunity from prosecution and [to] give self-incriminating testimony" that the Supreme Court has said unconstitutionally compels self-incrimination. *Cunningham*, 431 U.S. at 807.**[9]**

**B**

The district court relied on *Chavez v. Martinez*, 538 U.S. 760 (2003), for the proposition that mere compulsion does not violate the Fifth Amendment. In that case, a man exchanged gunfire with police and later was interrogated by a police officer while in excruciating pain from face wounds and in emergency treatment for the same. The state never used the fruits of this interrogation for any reason. The man sued the police officer under 42 U.S.C. § 1983 for violating his constitutional rights. The Ninth Circuit held that the officer had violated his rights. A divided Supreme Court, producing five different opinions, reversed and remanded.

Writing for himself and three colleagues, Justice Thomas characterized the underlying plaintiff's position as attempting to turn a failure to provide *Miranda* warnings into a violation of the federal constitution. Justice Thomas acknowledged that the law permits a witness to insist on immunity in order to memorialize the fact that his testimony had been compelled. *Chavez*,

---

**[8]**This is true whether or not a criminal investigation was ongoing. As it happens, the harness drivers clarified at the hearing on May 20, 2010, that they were asserting their rights against self-incrimination because of DeClercq's threats of prosecution.

**[9]**The MGCB does not dispute that it did not offer plaintiffs immunity at the time. Moody ultimately was immunized to some degree, although the parties dispute the extent of that immunity. None of the plaintiffs has been charged with a crime related to the original criminal and administrative inquiry.

538 U.S. at 772 (plurality op.). But Justice Thomas distinguished permission to assert "the Fifth Amendment privilege . . . in noncriminal cases" from the constitutional *right* against self-incrimination in criminal cases. *Ibid.* *Miranda*, Justice Thomas suggested, protected constitutional rights, but was not the same as those rights.

Justice Souter, writing for himself and Justice Breyer, suggested that the Court's "decision requires a degree of discretionary judgment greater than Justice Thomas acknowledges." *Id.* at 777 (Souter, J., concurring). Given the facts presented, however, Justice Souter agreed with Justice Thomas that the officer had not violated the underlying plaintiff's rights.[10] Because the Court's judgment depended on Justice Souter's fact-specific view of the law, Justice Thomas's broader suggestion—that mere compulsion of testimony, without more, does not violate constitutional rights against self-incrimination—does not bind us in different situations.

This case presents a situation different from that presented by *Chavez*. In *Chavez*, the underlying plaintiff *did answer* the police officer's questions; the state did not use those answers to incriminate him; the Court held that this state of affairs did not violate the plaintiff's constitutional rights. Here, the harness drivers *declined* to answer questions, standing on their rights not to incriminate themselves. Solely because the harness drivers asserted these rights, the MGCB both suspended their occupational licenses and also banned them from receiving new licenses. Had the state threatened to revoke their licenses but, after the plaintiffs asserted their rights against self-incrimination, not revoked their licenses at all (or revoked their licenses only on account of and only after a process proving their involvement in illegal gambling), we would have a different case. In other words, "*Chavez* only applies where a party actually makes self-incriminating statements. . . [T]he Fifth Amendment would be violated if a public employee

---

**10**Justice Kennedy, writing for himself and two of his colleagues, emphasized that "the Self-Incrimination Clause is a substantive constraint on the conduct of the government . . . ." *Chavez*, 538 U.S. at 791 (Kennedy, J., concurring in part and dissenting in part). Explicitly disagreeing with Justice Thomas, Justice Kennedy argued that the protection against coercion exists as "a present right." *Ibid.* "The Clause provides . . . a continuing right against government conduct intended to bring about self-incrimination." *Id.* at 791-92 (citing *Turley*, *Bram v. United States*, 168 U.S. 532, 542-43 (1897); and *Counselman v. Hitchcock*, 142 U.S. 547, 562 (1892)).

*Chavez* resulted in a remand to the Ninth Circuit on substantive-due-process grounds. Had Justices Kennedy, Stevens, and Ginsburg insisted on their "position, there would be no controlling judgment of the Court." *Chavez*, 538 U.S. at 799 (Kennedy, J., concurring in part and dissenting in part). Instead, Justice Kennedy allowed the Court to dispose of the case by remanding it and suggested that substantive due process could protect most of the rights outlined in the Self-Incrimination Clause. *Ibid.*

were fired for refusing to make self-incriminating statements, even though no self-incriminating statement could ever have been used against the employee." *Aguilera v. Baca*, 510 F.3d 1161, 1179 (9th Cir. 2007) (Kozinski, J., dissenting "for the most part").

The MGCB cites *McKinley v. Mansfield*, 404 F.3d 418 (6th Cir. 2005), "for the proposition that an individual does not suffer a Fifth Amendment violation unless compelled to be a witness against himself in a criminal case." Appellee Br. 5-6; *see also id.* at 27. *McKinley* concerned a police department's investigation of unlawful use of police-department scanners. The department interviewed the underlying plaintiff, explicitly promising not to use his statements against him in criminal proceedings without his permission. Despite this offer of immunity, he lied during the interview. The department interviewed him a *second* time. The prosecutor later sought to use the plaintiff's statements from the *second* interview in his prosecution for falsification and obstruction: i.e., not to prove that the plainfiff had used department scanners unlawfully but to prove that he had lied about not doing so during the first interview. *See McKinley*, 404 F.3d at 427. We acknowledged that "*Garrity* does not preclude use of such statements in prosecutions for the independent crimes of obstructing the public employer's investigation or making false statements during it." *Ibid.* However, because we concluded that there was "a genuine issue of material fact as to whether, at the time of [the policeman's] interview, he was the target of an independent falsification and obstruction investigation, and no longer a mere *Garrity* witness," *id.* at 430, we reversed the district court's grant of summary judgment to the police department and city on that claim.

Like *Chavez*, *McKinley* does not apply here. As Justice Thomas acknowledged in *Chavez*, "governments may penalize public employees and government contractors . . . to induce them to respond to inquiries [*only*] *so long as* the answers elicited . . . are immunized from use in any criminal case against the speaker." *Chavez*, 538 U.S. at 768 (plurality op.) (emphasis added). Here, plaintiffs asserted their rights clearly on May 20, 2010. But, for four years, the state declined to offer immunity or to allow plaintiffs to make a living at the racetrack.

The district court cited some cases without precedential authority and inapposite here. First, the district court cited *Aguilera v. Los Angeles*, 510 F.3d 1161 (9th Cir. 2007). In *Aguilera*, the plaintiffs had been threatened with transfer to less prestigious "job assignments and work

shifts," not total discharge. *Id.* at 1171; *see also id.* at 1173 (distinguishing "re-assignment from field to desk duty" from "losing one's job").[11]   Here, the district court erred in suggesting that "similar to the facts in *Aguilera*, [the harness drivers] were not *forced* to answer the stewards' questions . . . ." *Moody v. Mich. Gaming Control Bd.*, 2013 WL 6196947, at *9 (E.D. Mich. Nov. 27, 2013) (emphasis added).   In point of fact, they were.[12]   To subject plaintiffs to the choice between self-incrimination, perjury, or dismissal *is*, at least for Fifth Amendment purposes, to *force* them to answer.

The district court also cited *Morgan v. Columbus*, No. 92-4086, 1993 WL 389954 (6th Cir. Oct. 1, 1993).   In *Morgan*, the Columbus Police Department investigated the city's appointed deputy development director, a former officer with the department who also was a lawyer.   His superior told him to "answer those questions that you can. *I'm not asking you to answer things that you feel would incriminate.*" *Id.* at *4 (emphasis added).   During the hearing, the former officer read a substantial statement that did not mention the Fifth Amendment or the privilege against self-incrimination, but concluded with "[t]hat is my statement in its entirety today." *Id.* at *6.   The city subsequently fired him and he sued under § 1983.   We held that the plaintiff "was not deprived of a constitutional right" because he "was only required to answer those questions which he did not believe would infringe his constitutional rights," *id.* at *21, whereas here, defendants told plaintiffs that their licenses required them to answer questions and not to assert their rights against self-incrimination.   So *Morgan* does not dispose of this case.

### III

We turn to the process due to the harness drivers prior or subsequent to their suspension and exclusion.   "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolf v. McDonnell*, 418 U.S. 539, 558 (1974) (citing *Dent v. West Virginia*, 129 U.S. 114, 123 (1889)).   The Supreme Court has explained that identifying

---

[11]Even when the punishment is not equivalent to termination, the Ninth Circuit's position is not the only one.   In "[t]he Second, Seventh and Federal Circuits[, t]he government must tell public employees that they have immunity before it can constitutionally punish them for refusing to make self-incriminating statements." *Aguilera*, 510 F.3d at 1178 (Kozinski, J., dissenting "for the most part") (citing *Weston v. U.S. Dep't of Hous. & Urban Dev.*, 724 F.2d 943, 948 (Fed. Cir. 1983); *Confederation of Police v. Conlisk*, 489 F.2d 891, 895 & n.4 (7th Cir. 1973); and *Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation of N.Y.*, 426 F.2d 619, 621, 627 (2d Cir. 1970) (Friendly, J.)).

[12]For our purposes here, state licensees enjoy the same rights about their licenses that state employees do about their employment.

the specific dictates of due process generally requires consideration of three distinct factors: [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

"[T]he ordinary principle [is] that something less than an evidentiary hearing is sufficient prior to adverse administrative action." *Id.* at 343. But the courts, not the state, decide where that principle applies. A state may not condition a statutory entitlement on a beneficiary's acceptance of process so minimal that it fails to satisfy constitutional standards. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985).

The district court suggested that plaintiffs do not have a *liberty* interest in an occupation in the horse-racing industry and that plaintiffs do not have a property interest in the "mere *expectation* of being licensed by the Racing Commissioner" (emphasis added). But the harness drivers need only to demonstrate *property* interests—the harness drivers can demonstrate that they have a property interest in their licenses in two ways.

## A

First, the Supreme "Court has consistently held that some kind of hearing is required at some time before a person is finally deprived of his property interests. The requirement for some kind of hearing applies to . . . the revocation of licenses . . . ." *Wolf*, 418 U.S. at 557-58 (citing *Joint Anti-Fascist Refugee Cmte. v. McGrath*, 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring); and *In re Ruffalo*, 390 U.S. 544 (1968)). "Suspension of issued licenses . . . involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment." *Bell v. Burson*, 402 U.S. 535, 539 (1971). In addition, a state's establishment of process means that "state law has engendered a clear expectation of continued enjoyment of a license absent proof of culpable conduct . . . ." *Barry v. Barachi*, 443 U.S. 55, 64 n.11 (1979)

(citing *Perry v. Sindermann*, 408 U.S. 593, 601 (1972); *Bd. of Regents v. Roth*, 408 U.S. 564 (1972); *Bell*, 402 U.S. at 539; and *Goldberg v. Kelly*, 397 U.S. 264 (1970)).

In Michigan, the racing commissioner can license people to participate in horse racing and wagering and can promulgate rules to that effect. M.C.L. 431.307(1). In addition, "[t]he racing commissioner may . . . investigate . . . a licensee . . . to ensure compliance . . . ." M.C.L. 431.307(7). To that end,

> [u]pon the filing of a written complaint . . . or . . . motion of the racing commissioner regarding . . . a person issued a[n] occupational license [for harness driving], the racing commissioner may summarily suspend the occupational license . . . not more than 90 days pending a hearing and final determination . . . regarding of the acts or omissions complained of . . . , if the commissioner determines . . . that the public health, safety, or welfare requires emergency action. The racing commissioner shall schedule the [hearing to occur] within 14 business days after the [summary suspension.] The hearing shall be conducted in accordance with the contested case provisions of the administrative procedures act . . . .

M.C.L. 431.316(7). The Michigan Administrative Procedures Act, in turn, provides that "[t]he parties [in a contested case] shall be given a reasonable notice of the hearing, which notice shall include: . . . . [a] reference to the particular sections of the statutes and rules involved" and "the issues involved." M.C.L. 24.271(2). Because Michigan has established a process for appealing suspensions of licenses, the harness drivers had property interests in their licenses.[13]

**B**

Second, although a state statute "does not affront the Due Process Clause by authorizing summary suspensions" of horse-racing licenses "without a presuspension hearing," *Barry*,

---

[13]The harness drivers suggest that the Michigan law "sets forth the *basic due-process requirements* of contested-case proceeding where the administrative agency intends to suspend an occupational license." Appellant Br. 23 (emphasis added). To the extent they mean *federal constitutional* due-process requirements, they err. It is true that, "under section 92 of the [Michigan] Administrative Procedures Act, two notices to the licensee are required before a revocation hearing may be held." *Rogers v. Mich. St. Bd. of Cosmetology*, 244 N.W.2d 20, 22 (Mich. Ct. App. 1976). In all, the act requires four steps: (1) issuance of notice, (2) informal opportunity to show compliance, (3) only if licensee does not offer to comply, issuance of notice of hearing, which commences proceedings, (4) hearings. *Id.* at 21-22. The Act requires informal opportunity to show compliance because "the Legislature intended to delay the revving up of the formal bureaucratic machinery." *Id.* at 23. In addition, "proceedings do not commence . . . when the parties physically assemble [but rather] with the mailing of the notice of the hearing . . . by analogy [to] the civil forum, [wherein] the filing of the complaint initiates the proceedings." *Ibid.* But while § 1983 provides a remedy for violations of *federal* rights, the amount and kind of process due to a licensee under the Constitution is not necessarily equivalent to the process to which a state statute entitles him as a matter of state law.

443 U.S. at 63, *we* do not need to apply the *Mathews* criteria to the harness drivers, because the *Supreme Court* already has done so: a suspended harness-horse trainer (and so, we presume, a harness driver) is due the process of "a prompt postsuspension hearing," *id.* at 66.

The harness drivers received a postsuspension hearing in Michigan state court. Whether or not plaintiffs ought to have received, as matter of Michigan state law, an additional hearing in front of an administrative agency does not affect the federal constitutional analysis. So we affirm the district court's grant of summary judgment insofar as it held that the defendants' suspension of plaintiffs did not violate the plaintiffs' due-process rights.

**C**

In November and December 2010, Richard Kalm, Executive Director of the MGCB, issued orders of exclusion as to each harness driver. Each order proceeded in the same way. Each identified the harness driver as a licensee suspended for "failing to comply with the conditions precedent for occupational licensure . . . ." *See, e.g.*, Kalm, Order of Exclusion In the Matter of John Moody at 1 (Nov. 30, 2010) (citing M.C.L. 431.316(1); and 1985 M.R. 6, R 431.1035). Reciting that the harness driver had "asserted that he had the right to invoke a 5th Amendment right against self-incrimination in response to questions asking whether he ever failed to give his best efforts in a race or ever accepted money to alter the outcome of a race," the Order stated that "[b]ased on the continued and ongoing administrative investigation into race fixing, information that [the plaintiff] was involved in race fixing, *and his failure to cooperate*, [he] . . . is to be excluded from horse racing tracks . . . . [Kalm] deems it necessary to be proactive to preserve the integrity of horse racing in the State of Michigan and to protect the public health, safety and welfare." *See, e.g.*, *id.* at 1-2 (emphasis added).

The harness drivers were due the process of a postexclusion hearing for the two reasons that they were due the same for their suspensions: the general principle of a hearing before final or permanent deprivation, and the *Barry* Court's holding that the *suspension* of a jockey's license entitles him to a post-deprivation hearing. We also note that the Exclusion Orders seem to contemplate as much: the Order concluded by acknowledging that "[u]pon written request, [the plaintiff] has a right to a hearing de novo before the Executive Director." *Ibid.* The harness drivers were due the process of a hearing, which they did not receive.

But the harness drivers would fail on this due-process claim, as well, if they had failed to request a hearing. On the harness drivers' account, they "awaited the outcome in the Michigan Court of Appeals" before requesting a hearing about their exclusion. Appellant Br. 36. That court issued its decision on July 21, 2011, declaring the issue of the suspension of 2010 licenses moot. The harness drivers claim that, in August 2011, they "called and met with Defendants regarding re-licensure . . . ." *Ibid.* According to the harness drivers, the MGCB ultimately took the position that the relevant rules and regulations entitled plaintiffs to appeal only within ten days of the order of exclusion. *Ibid.* In a letter dated November 16, 2011, the MGCB's Horse Racing Manager stated that "the time to appeal the Exclusion Order has long passed." Ernst Letter. Similarly, on January 13, 2012, the MGCB told the harness drivers that "an Exclusion Order was entered against you that you did not appeal. As such, you are excluded indefinitely from licensure . . . ." *See, e.g.*, Letter from Erik Pedersen, Div. of Horse Racing, Audit & Gaming Technology, to John R. Moody at 1 (Jan. 13, 2012). This later letter, though, suggested that the harness drivers might still appeal their 2010 suspension. *Id.* at 1-2.

The regulation under which the Racing Commissioner excluded the plaintiffs provides that:

> Any person who is ordered to be . . . excluded . . . shall, upon written request, have the right to a hearing de novo before the commissioner to review the order . . . unless such a hearing has already been held before the commissioner under [M.C.L. § 24.201 et seq.] and a final determination made by the commissioner before issuance of the order under review. Upon such a request, the commissioner shall schedule . . . the hearing to be held within 14 days . . . . The hearing shall be held pursuant to [M.C.L. § 24.201 et seq.]. The person shall remain . . . excluded . . . not more than 90 days after receipt of a request for review pending the hearing and final determination of the commissioner regarding the order . . . under review.

Mich. Admin. Code R. 431.1130(3). The language of the regulation seems not to contemplate a deadline for appeal. The harness drivers do not demonstrate that they ever clearly submitted "a written request" for review.

That omission still does not end the inquiry. No one disputes that, despite the Exclusion Orders in late 2010, the harness drivers applied for 2011 licenses (and, subsequently, for 2012, 2013, and 2014 licenses). A reasonable juror might conclude that the MGCB should have

construed those applications as requests for the hearings due to them under the federal constitution and state regulations. After all, the MGCB seemed to construe the harness drivers' applications for 2011 licenses as an "attempt[t] to recreate either an administrative or judicial appeal process." Ernst Letter. If the MGCB, in point of fact, did construe the harness drivers' applications as written requests for appeal, then the harness drivers were due the process of a hearing concerning their Exclusion Orders. Such an outcome makes policy sense. If a licensee regards his un-reviewed exclusion from licensure to be an error, and so applies for a license, due-process doctrine favoring hearings prior to final deprivation would seem to require that his application trigger the review owed to him.

We hold that there is a disputed issue of material fact as to whether the defendants denied plaintiffs the process they were due or whether the plaintiffs failed to seek that process. We reverse the grant of summary judgment on plaintiffs' due-process claims that they were denied their rights to a hearing after their exclusion and remand the question to the district court.

**IV**

After discovery, plaintiffs moved to amend their complaint to include a First Amendment retaliation claim. The district court denied that motion. We do not review the district court's denial because, as the MGCB correctly suggests, "the Harness Drivers have not appealed the District Court's denial of leave to amend the Complaint" to include a First Amendment retaliation claim. Appellee Br. 38.

Because we reverse summary judgment, the case will return to the district court. There, plaintiffs can move for the district court to reconsider its decision to deny plaintiffs' motion to amend its complaint. If the district court denies that motion, the plaintiffs can appeal that denial after final judgment.

**V**

In conclusion, we AFFIRM the district court's grant of summary judgment to the MGCB on the harness drivers' due-process claims about their suspensions. We REVERSE the district court's grant of summary judgment to the MGCB on the harness drivers' due-process claims about their exclusions and self-incrimination claims, and REMAND the case to the district court

for further proceedings on these three issues: did the harness drivers request hearings on their exclusions, did their self-incrimination and due-process claims involve clearly established rights, and, if so, should an officer in the MGCB's position have known about those rights?  If, on a pretrial motion or after trial, the district court finds that the MGCB is liable on one or more of the harness drivers' claims, the district court should determine what damages the MGCB owes the harness drivers.