CONCURRING IN PART AND DISSENTING IN PART
ALICE M. BATCHELDER,
Circuit Judge, concurring in part and dissenting in part.
I agree with the majority—albeit for different reasons—that the district court did not err by holding that there is a material dispute of fact over whether there was a constitutional violation on the drivers’ procedural due process claim. I part ways with the majority on its analysis of the Fifth Amendment claim and would affirm the district court’s grant of qualified immunity. Accordingly, I respectfully concur in part and dissent in part.
I.
I begin with the majority’s treatment of the drivers’ post-exclusion procedural due *431 process claim. On a motion for summary judgment, a plaintiff who brings a § 1983 action against a government official bears the burden of overcoming the qualified immunity defense by showing that (1) the defendant violated a constitutional right and (2) that right was clearly established. Quigley v. Tuong Vinh Thai, 707 F.3d 675, 680-81 (6th Cir. 2013). When we previously resolved an appeal in this case, we held that the drivers were “due the process of ‘a prompt postsuspension hearing,’ ” which the drivers had received. Moody v. Mich. Gaming Control Bd., 790 F.3d 669, 679 (6th Cir. 2015) (“Moody I”) (quoting Barry v. Barchi, 443 U.S. 55, 66, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979)). We also held that the drivers had the same right following their exclusions, applying the principles that a person is due “some kind of hearing ... at some time before ... [being] finally deprived of his property interests” and that “the suspension of a jockey’s license entitles him to a post-deprivation hearing.” Id. at 677, 679 (extending Wolff v. McDonnell, 418 U.S. 539, 557-58, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and Barry, 443 U.S. at 66, 99 S.Ct. 2642, to hold that a harness driver has a right to post-exclusion due process).
For purposes of my analysis, I assume that the right was clearly established.[1] Although I agree with the majority that the district court did not err by holding that there are material, disputed facts concerning whether there was a constitutional violation here, I cannot subscribe to the majority’s rationale. The majority allows the drivers to modify their claim from one of no-due-process to one of untimely-due-process. It does so by relying on the law-of-the-case doctrine, which I find unnecessary. I would find that the drivers survive summary judgment on their post-exclusion due process claim on the basis of Moody I, as well as the standards governing summary judgment.
The rationale of Moody I’s holding was that if the drivers had requested a post-exclusion hearing through their license applications, then MGCB violated the drivers’ due process right by denying them a post-exclusion hearing. Moody I, 790 F.3d at 679 (holding that the drivers would fail on this due process claim “if they had failed to request a hearing” (emphasis added)). Accordingly, we remanded “to the *432 district court for further proceedings on [whether] the harness drivers requested] hearings on their exclusions.” Id. at 681. The implication in our prior opinion was that the drivers were obliged to adduce further evidence on remand to demonstrate that the drivers had, in fact, requested a hearing. Instead, confronted with the fact that they had received a hearing on their exclusions, the drivers changed rein to focus on whether that hearing was timely, while MGCB focused on whether the drivers had requested a hearing in the first place.
To unravel this knot, I turn to the standards applicable in a summary judgment proceeding and on an appeal of such a proceeding. MGCB moved for summary judgment on this issue, so the drivers were obliged to produce more than a “mere scintilla of evidence” to demonstrate that there was a genuine issue of material fact. Novak v. MetroHealth Med. Ctr., 503 F.3d 572, 577 (6th Cir. 2007) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). We view the evidence and draw any inferences in the light most favorable to the drivers. Id. (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). And because MGCB appeals the denial of its qualified-immunity-based motion for summary judgment, we review the legal issues and decline to review the sufficiency of the factual allegations. DiLuzio v. Vill. Of Yorkville, Ohio, 796 F.3d 604, 609 (6th Cir. 2015).
MGCB produced a bevy of evidence— some of which was new—to support its argument that it had not construed the drivers’ license applications as appeals of the exclusion orders. But because MGCB moved for summary judgment and now appeals the denial of its motion, we are less concerned with the evidence it adduced than with the drivers’ response to the motion. Indeed, we make no factual findings. The district court relied on Moody I to hold that there is a genuine dispute of material fact, so that is what we review. The onus was on the drivers to demonstrate more than a mere scintilla of evidence in support of their claims. On that point, they had formidable assistance in the form of Moody Ts pronouncement that “[a] reasonable juror might conclude that the MGCB should have construed those applications as requests for the hearings due to them under the federal constitution and state regulations” and its citation to the Ernst Letter. 790 F.3d at 680. On remand, the drivers relied on this explanation, as well as letters from A1 Ernst and Erik Pedersen, both employees of MGCB, to argue that it was “undisputed” that the drivers requested a hearing on their exclusions. On appeal, they argue that it “cannot be seriously disputed that [they] requested hearings on the exclusion orders.” Without our prior opinion, I would find it necessary to reject these claims, because MGCB has done quite a bit to show that there is a dispute over this issue. But my conclusion must be tempered by our prior opinion. On the evidence before the court, Moody I explained that a juror could find that MGCB should have construed the license applications as appeals of the exclusion orders. When it remanded the case for further proceedings, it did not explain that the drivers necessarily had an obligation to adduce further evidence to establish its claim and satisfy its burden on summary judgment. The drivers took this to mean that we had found this to be an undisputed fact.
The drivers offered the same evidence before both the Moody I panel and us. I am satisfied that the drivers should survive summary judgment at this point, because we view the evidence and draw inferences in their favor. Although they *433 failed to produce any additional evidence, Moody Ts holding gives the drivers enough of an edge to carry their burden at summary judgment now. MGCB’s evidence is “no bum steer”[2] and may well carry the day before a jury. But I cannot agree that the drivers have failed to meet their burden such that we can condone a grant of summary judgment in favor of MGCB.
I would affirm the denial of qualified immunity on the procedural due process claim for these reasons. Accordingly, I concur in the majority’s affirming the order of the district court.
II.
A.
Turning to the majority’s analysis of the Fifth Amendment privilege against self-incrimination, I respectfully dissent. In a qualified immunity ease, the clearly established analysis “must be undertaken in light of the specific context of the case, not as a broad general proposition.” Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), abrogated in part by Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). “[W]e need not find a case in which ‘the very action in question has previously been held unlawful,’ but, ‘in the light of preexisting law, the unlawfulness must be apparent.’ ” Comstock, 273 F.3d at 711 (brackets omitted) (quoting Anderson, 483 U.S. at 640, 107 S.Ct. 3034). To evaluate the contours of the right, “we must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.” Baker v. City of Hamilton, Ohio, 471 F.3d 601, 606 (6th Cir. 2006) (internal quotation marks omitted). Although the Supreme Court “ ‘does not require a case directly on point’ for a right to be clearly established, ‘existing precedent must have placed the statutory or constitutional question beyond debate.’ ” White v. Pauly, — U.S.—, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017) (per cu-riam) (internal brackets and quotation marks omitted) (quoting Mullenix v. Luna, — U.S. —, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (per curiam)).
At “a high level of generality,” id. at 552, 137 S.Ct. 548 (citation omitted), a public employee or, in this case, a licensee may refuse to answer questions that may tend to incriminate himself unless and until he has immunity from prosecution on the basis of his answers to the State’s questions. Moody I was correct to explain that “ ‘a governmental body may not require an employee to waive his privilege against self-incrimination as a condition to keeping his job ... even [when] no criminal proceedings were ever instituted against’ an employee who was later successful in constitutional claims.” Moody I, 790 F.3d at 674 (alteration in original) (quoting Lingler v. Fechko, 312 F.3d 237, 239 (6th Cir. 2002)).
I part ways with the majority, however, because it does not—and cannot—point to “clearly established law [that is] ‘particularized’ to the facts of [this] case.” White, 137 S.Ct. at 552 (quoting Anderson, 483 U.S. at 640, 107 S.Ct. 3034). The majority finds clearly established Moody I’s holding that MGCB violated the drivers’ rights when it “did not offer [them] immunity before the hearing.” Moody I, 790 F.3d at 674. Based on my understanding of the Supreme Court’s precedent, I cannot agree. Moreover, the majority fails to grapple with binding precedent from our *434 circuit that undermines its holding that the right at issue was clearly established. See Lingler, 312 F.3d at 239-40 (holding that it was not a constitutional violation for a police chief to exact statements from police officers concerning their employment when they were not required to waive their privilege against self-incrimination and the statements were not used against them in a criminal proceeding).
The majority finds that the right at issue was clearly established on the basis of Lefkowitz v. Turley, 414 U.S. 70, 78, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973), which, in its view, defined “precisely the right announced in Moody I.” There, the Supreme Court reviewed New York state laws requiring the State to cancel contracts and disqualify contractors from future State contracts when a contractor “refuses to waive immunity or to answer questions when called to testify.” Id. at 71-72, 94 S.Ct. 316. Two licensed architects subject' to these laws “were summoned to testify before a grand jury,” where the architects refused to sign waivers of immunity. The district attorney thereafter notified the contracting agencies of the architects’ refusal to waive their immunity, and the architects brought an action seeking to declare New York’s statutes unconstitutional. The Supreme Court explained that “a witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant.” Id. at 78, 94 S.Ct. 316 (citing Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972)). It also analyzed the animating policy behind this line of cases:
[The eases] .ultimately rest on a reconciliation of the well-recognized policies behind the privilege of self-incrimination, and the need of the State, as well as the Federal Government, to obtain information to assure the effective functioning of government. Immunity is required if there is to be rational accommodation between the imperatives of the privilege and the legitimate demands of government to compel citizens to testify.
Id. at 81, 94 S.Ct. 316 (internal citations and quotation marks omitted); see also id. at 84, 94 S.Ct. 316 (“Although due regard for the Fifth Amendment forbids the State to compel incriminating answers from its employees and contractors that may be used against them in criminal proceedings, the Constitution permits that very testimony to be compelled if neither it nor its fruits are available for such use.”). This policy ensures that governments are able to maintain integrity through investigations, but this comes at a cost—the government may not use testimony gathered as part of such an investigation to prosecute a participant in that investigation.
It is not until the very end of Turley that one sees any language implying that the state must offer immunity.
But the State may not insist that appel-lees waive their Fifth Amendment privilege against self-incrimination and consent to the use of the fruits of the interrogation in any later proceedings brought against them. Rather, the State must recognize what our cases hold: that answers elicited upon the threat of the loss of employment are compelled and inadmissible in evidence. Hence, if answers are to be required in such circumstances States must offer to the witness whatever immunity is required to supplant the privilege and may not insist that the employee or contractor waive such immunity.
Id. at 84-85, 94 S.Ct. 316 (emphasis added). The majority emphasizes the italicized language in this quotation, but, in context, it is clear why it was necessary in Turley. *435 New York had required the architects both to sign a waiver of their Fifth Amendment' rights and to consent to the use of their testimony in a subsequent prosecution, and all of this occurred when the architects were before the grand jury. Such is not the case here. The hearing we are concerned with was before a racing regulator, and the drivers do not suggest that the regulator had either the power to bring a criminal proceeding against them or to immunize them from prosecution without the involvement of a prosecutor. Nor have the drivers pointed to anything in the record suggesting that MGCB asked them to sign away their Fifth Amendment rights. Indeed, unlike the New York law at issue in Turley that explicitly required the architects to waive their immunity, the Michigan law requiring compliance with an investigation does not condition licensure on the waiver of the right. The drivers certainly did not lose their Fifth Amendment rights in this hearing, and could reasonably fear their answers might be used against them in a subsequent prosecution. But we have held that the mere “threat of disciplinary action” does not create an implicit waiver of the privilege against self-incrimination. See Lingler, 312 F.3d at 239 (“[T]he officers contend that a waiver of the privilege is implicit in any statement given by a public employee under threat of disciplinary action. The caselaw does not support this contention—and ... any such waiver would have been ineffective.”). In light of these key distinctions, I cannot agree that Turley clearly established the right in question here.
I acknowledge that a threat of termination can be coercion that violates the Fifth Amendment, see Turley, 414 U.S. at 80-83, 94 S.Ct. 316, and the drivers’ Fifth Amendment rights are not watered down in such a situation. See Lefkowitz v. Cunningham, 431 U.S. 801, 805-06, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977) (“[0]ur cases have established that a State may not impose substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself.”). But the applicable precedent is not so simple. See id. at 806, 97 S.Ct. 2132 (“Public employees may constitutionally be discharged for refusing to answer potentially incriminating questions concerning their official duties if they have not been required to surrender their constitutional immunity.”). It requires us to parse out the nature of the investigation and the source of the threat of termination. In Gardner v. Bro-derick,
If appellant, a policeman, had refused to answer questions specifically, directly, and narrowly relating to the performance of his official duties, without being required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself[,] the privilege against self-incrimination would not have been a bar to his dismissal.
The facts of this case, however, do not present this issue. Here, petitioner was summoned to testify before a grand jury in an investigation of alleged criminal conduct. He was discharged from office, not for failure to answer relevant questions about his official duties, but for refusal to waive a constitutional right. He was dismissed for failure to relinquish the protections of the privilege against self-incrimination. The Constitution of New York State and the City Charter both expressly provided that his failure to do so, as well as his failure to testify, would result in dismissal from his job. He was dismissed solely for his refusal to waive the immunity to which he is entitled if he is required to testify despite his constitutional privilege.
*436 392 U.S. 273, 278, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968) (citations and footnote omitted). Gardner distinguishes between situations in which a public employee is asked questions concerning performance of his duties and those in which the State asks him to waive his immunity. A threat of termination in the former is clearly permissible, whereas immunity must accompany such a threat in the latter. Here, it is not clear that the Steward’s Hearing was tantamount to a proceeding before the grand jury in which a witness must waive the privilege against self-incrimination. The Steward’s Hearing addressed allegations about the drivers’ possible involvement in race-fixing, which directly relates to the public license they held. This falls within the first scenario contemplated by Gardner. As for the second Gardner scenario, there was no grand jury and there was no request that the drivers sign away their constitutional rights. Therefore, Gardner cannot be the basis for determining whether this right was clearly established, because the threat of termination following the Steward’s Hearing could have been permissible if it was “narrowly relating to the [drivers’] performance” as state licensees. Gardner, 392 U.S. at 278, 88 S.Ct. 1913.
I cannot agree that Turley, Gardner, and like cases provide the proper lens through which we should assess this case for purposes of qualified immunity. These cases address different situations from the one here. The question, then, is whether MGCB needed to “offer” immunity in the form of notifying the drivers that their testimony could not be used against them. This is where Garrity, which is the progenitor of the other cases I have discussed so far, fits into the picture.
B.
In Garrity, the Supreme Court held that a statement obtained under the coercive threat of removal from office violates the Constitution. See Garrity v. New Jersey, 385 U.S. 493, 499, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). And in a companion case to Garrity, the Supreme Court explained the constitutional problem as requiring employees to choose “between surrendering their constitutional rights or their jobs,” but holding that employees would “subject themselves to dismissal if they refuse to account for their performance of their public trust, after proper proceedings, which do not involve an attempt to coerce them to relinquish their constitutional rights.” Uniformed Sanitation Men Ass’n v. Comm’r of Sanitation, 392 U.S. 280, 284-85, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968). Courts have construed- Garrity as effectively immunizing a public employee’s or licensee’s statements from being used against her -in a subsequent prosecution by explaining that such statements would be rendered inadmissible in such a prosecution.[3] See Lingler, 312 F.3d at 239. In fact, even in Turley, the Supreme Court construed Garrity to mean that if evidence *437 was obtained in violation of the principle that a party may not be forced to waive her immunity, “any answers elicited [would be] inadmissible.” Turley, 414 U.S. at 80-81, 94 S.Ct. 316 (citing Garrity, 385 U.S. at 499-500, 87 S.Ct. 616); cf. Lingler, 312 F.3d at 240 (explaining that the law does not support the contention that “a waiver of the privilege is implicit in any statement given by a public employee under threat of disciplinary action” and that under Garrity, “any such waiver would have been ineffective”).
Interpreting Garrity to mean that coerced testimony cannot be used in a subsequent criminal proceeding, however, leaves an important question unanswered: is that effect of the Fifth Amendment privilege against self-incrimination a self-executing one, or must the public employer or agency affirmatively make its employee, contractor, or licensee aware of the immunity that Garrity affords? In Moody I, we concluded that MGCB had an affirmative obligation to notify the drivers that they were afforded immunity in exchange for being threatened with the loss of their licenses. In effect, we created a prophylactic rule, but this rule had not been in place before. The district court was therefore correct when it explained that “[w]hat was not clearly established in this Circuit [before Moody I\ was whether the State was required to offer immunity in the first place.” Moody v. Mich. Gaming Control Bd., 202 F.Supp.3d 756, 760 (E.D. Mich. 2016).
This is the proper lens through which to analyze this case, so I cannot find that the right had been clearly established before Moody I. The Supreme Court has not directly addressed how this right plays out in non-prosecutorial administrative proceedings, as I discussed above. Nor has our circuit addressed this previously. And looking to the other circuits demonstrates precisely why I cannot find that the right announced in Moody I was clearly established, for it is the subject of a circuit split among the various United States Courts of Appeals. See, e.g., Sher v. U.S. Dep’t of Veterans Affairs, 488 F.3d 489, 503 (1st Cir. 2007) (“The circuits have taken different approaches to the issue of whether a government employer is required to provide such notice to an employee.”); compare, e.g., Atwell v. Lisle Park Dist., 286 F.3d 987, 990 (7th Cir. 2002) (“Our court has ruled in several cases that the government employer who wants to ask an employee potentially incriminating questions must first warn him that because of the immunity to which the cases entitle him, he may not refuse to answer the questions on the ground that the answers may incriminate him.”), with Hill v. Johnson, 160 F.3d 469, 471 (8th Cir. 1998) (“[T]he mere failure affirmatively to offer immunity is not an impermissible attempt to compel a waiver of immunity.”). This split of authority, although not acknowledged by the majority, supports my conclusion that the law was not clearly established prior to Moody I. To saddle MGCB with the unjustified holding that this issue was clearly established before Moody I runs counter to the qualified immunity doctrine. I therefore respectfully dissent.

. In Moody I, we held that a driver is "due the process of a postexclusion hearing" by extending Barry to cover “exclusions” in addition to "suspensions.” During that discussion, we did not discuss whether the law was clearly established, but our remand order asked the district court to consider whether the drivers' “due-process claims involve[d] clearly established rights.” 790 F.3d at 679, 681. On remand, the district court explained that whether the "post-exclusion due process rights were clearly established” was not up for debate, citing Michigan law. The majority in this appeal treats Moody I as if we held that the right was clearly established in spite of the remand instruction. Moody I's analysis of the right at issue implied that the leap from suspensions to exclusions was not a large one. In some cases, the extension of a principle can satisfy our duty to determine whether a right was clearly established. Cf. Comstock v. McCrary, 273 F.3d 693, 711 (6th Cir. 2001) ("[W]e need not find a case in which 'the very action in question has previously been held unlawful,’ but, ‘in the light of pre-existing law, the unlawfulness must be apparent.' ” (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (brackets omitted))). I question whether the right was clearly established prior to Moody I, but I understand why the majority found that Moody I determined the right was clearly established. If we were to consider this issue, I would examine the differences under Michigan law between suspensions and exclusions, the effect of our opinion in Rodic v. Thistledown Racing Club, Inc., 615 F.2d 736, 739 (6th Cir. 1980), and why the district court’s citation to state law alone is likely insufficient to "be the basis for a federal constitutional violation” pursuant to Smith v. City of Salem, Ohio, 378 F.3d 566, 578 (6th Cir. 2004).

. Cf. Frank Loesser, Fugue for Tinhorns, on Guys & Dolls (Original Broadway Cast Recording) (Decca 2000) (1950).

. The majority finds that “Garrity immunity may not necessarily be coextensive with 'whatever immunity is required to supplant the [Fifth Amendment] privilege.’ ” Maj. Op. at 428 (quoting Turley, 414 U.S. at 84-85, 94 S.Ct. 316). It further notes that in Kastigar v. United States, 406 U.S. 441, 458, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the Supreme Court held that the Fifth Amendment protects against the use and the derivative use of coerced statements at trial and that this “exceeds the grant articulated in Garrity.1' Maj. Op. at 428. Even if they are right that Kasti-gars view of immunity exceeds Garrity’s, this is a question for another day. Here, we are not concerned with evidence—direct, derivative, or otherwise—that was presented to a jury, so we have no occasion to determine whether Garrity would render some such hypothetical evidence inadmissible but allow other hypothetical evidence to be admitted.