RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0211p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JOHN MOODY; DONALD HARMON; RICK RAY; WALLY McILLMURRAY,

> *Plaintiffs-Appellees/Cross-Appellants*,

*v.*

MICHIGAN GAMING CONTROL BOARD, et al.,

> *Defendants*,

AL ERNST; JOHN LESSNAU,

> *Defendants-Appellants/Cross-Appellees*.

Nos. 16-2244/2369

---

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 4:12-cv-13593—Gershwin A. Drain, District Judge.

Argued:  July 26, 2017

Decided and Filed:  September 11, 2017

Before:  COLE, Chief Judge; BATCHELDER and MOORE, Circuit Judges.

---

## COUNSEL

**ARGUED:**  Jason A. Geissler, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants/Cross-Appellees.  Hugh M. Davis, CONSTITUTIONAL LITIGATION ASSOCIATES, P.C., Detroit, Michigan, for Appellees/Cross-Appellants.  **ON BRIEF:**  Jason A. Geissler, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants/Cross-Appellees.  Hugh M. Davis, Cynthia Heenan, Scott Mackela, CONSTITUTIONAL LITIGATION ASSOCIATES, P.C., Detroit, Michigan, for Appellees/Cross-Appellants.

MOORE, J., delivered the opinion of the court in which COLE, C.J., joined, and BATCHELDER, J., joined in part. BATCHELDER, J. (pp. 13–22), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge. In 2010, the Michigan Gaming Control Board ("MGCB"), a state entity that regulates horse racing, held a hearing to determine whether certain drivers were involved in an illegal race-fixing scheme. At the hearing, Plaintiffs John Moody, Donald Harmon, Rick Ray, and Wally McIllmurray, Jr. ("Plaintiffs"), four drivers licensed by the MGCB, declined to answer questions and invoked their Fifth Amendment right against self-incrimination. The MGCB later suspended the Plaintiffs' licenses and issued orders excluding them from the race tracks, citing the Plaintiffs' refusal to cooperate at the hearing. The Plaintiffs filed suit, alleging violations of their procedural due process and Fifth Amendment rights. In these appeals, which revisit issues considered by a prior panel of this court, the Defendants challenge the district court's denial of qualified immunity on the procedural due process claim, and the Plaintiffs challenge the district court's grant of qualified immunity on the Fifth Amendment claim.

For the following reasons, we **AFFIRM** the denial of qualified immunity on the procedural due process claim, **REVERSE** the grant of qualified immunity on the Fifth Amendment claim, and **REMAND** the case for further proceedings.

**I. BACKGROUND**

Upon receiving an anonymous tip, the MGCB began to investigate allegations of a race-fixing scheme involving certain gamblers and harness-racing drivers. As part of this investigation, the MGCB held an administrative investigatory hearing on May 20, 2010, with the Plaintiffs, all of whom were licensed by the MGCB as harness drivers. The hearing, referred to by some as the "Steward's hearing," was held to determine whether these drivers were involved in the scheme. At the hearing, all four drivers declined to answer questions and invoked their Fifth Amendment right against self-incrimination. R. 18–5 (Moody MGCB Hr'g Tr. at 5–8)

(Page ID #197–200); R. 18–6 (Harmon MGCB Hr'g Tr. at 5–13) (Page ID #212–20); R. 18–7 (McIllmurray MGCB Hr'g Tr. at 6–10) (Page ID #230–34); R. 18–8 (Ray MGCB Hr'g Tr. at 7–11) (Page ID #245–49). The next day, the MGCB suspended the Plaintiffs' licenses, citing their failure "to comply with the conditions precedent for occupational licensing in Michigan as outlined in R431.1035." R. 18–9 (Stewards Hr'g Ruling) (Page ID #254–57). This rule provides that an applicant for an occupational license must "cooperate in every way . . . during the conduct of an investigation, including responding correctly, to the best of his or her knowledge, to all questions pertaining to racing matters." Mich. Admin. Code R. 431.1035. Later, on November 30, 2010, the MGCB issued orders of exclusion banning the drivers from all state race tracks, again citing their "'failure to cooperate' at the time of the Steward's Hearing in May 2010." R. 85–16 (Ernst Letters) (Page ID #1377–79). The Plaintiffs' applications for 2011, 2012, and 2013 licenses were also denied.

In August 2012, the Plaintiffs brought suit under 42 U.S.C. § 1983, claiming violations of their procedural due process and Fifth Amendment rights. On November 27, 2013, the district court held that the Defendants were entitled to qualified immunity because the Plaintiffs had failed to identify a constitutional violation. It therefore granted the Defendants' motion for summary judgment and denied the Plaintiffs' motion for partial summary judgment. On appeal, we affirmed in part and reversed in part the district court's holding with respect to Plaintiffs' procedural due process claim, and held that although Plaintiffs had received due process with respect to their license suspensions, there was a disputed issue of material fact as to whether the Plaintiffs were denied due process on their exclusion from the race tracks. *Moody v. Michigan Gaming Control Bd.*, 790 F.3d 669, 680 (6th Cir. 2015) ("*Moody I*"). Specifically, we found that the Plaintiffs were due a post-exclusion hearing, which they did not receive, and that there was a genuine dispute as to whether or not Plaintiffs were themselves at fault for failing to request a hearing. *Id.* at 679–80. As to the Plaintiffs' Fifth Amendment claim, we reversed the district court's holding that Plaintiffs had failed to identify a constitutional violation. We held that the "Constitution entitled the harness drivers to refuse to answer potentially self-incriminating questions, unless the state immunized them from prosecution. To punish the drivers violated the Constitution, and both suspension and exclusion constitute punishment." *Id.* at 673. We therefore found that the Defendants had violated the drivers' constitutional rights against self-

incrimination, and remanded to the district court to consider the question of whether that right was clearly established at the time of the violation. *Id.*

On remand, the parties filed renewed cross-motions for summary judgment. The Defendants argued that we erred in concluding that the Plaintiffs did not receive a post-exclusion hearing, because Plaintiffs received a hearing on April 25, 2013, two years before our initial remand. The Plaintiffs, in response, conceded that a post-exclusion hearing took place on that date, but argued that the hearing, which occurred two years after the exclusion orders were issued, was not timely. On the Fifth Amendment claim, the Defendants argued, once again, that the Plaintiffs had failed to identify a constitutional violation, and that the right to be offered immunity against self-incrimination was not clearly established at the time of the violation.

The district court held that the Defendants' argument with respect to the April 2013 hearing was irrelevant to the question on remand, and re-emphasized our holding that there was "a dispute of fact regarding whether the 2011 license applications constituted hearing requests." R. 172 (Dist. Ct. Order at 12) (Page ID #4144). It concluded once again that neither party was entitled to summary judgment on the procedural due process claim. The district court also held that the Fifth Amendment violation identified in *Moody I* was not clearly established at the time of the violation, because "before the Sixth Circuit's decision in *Moody [I]*, a reasonable officer could have believed, as the [district c]ourt did, that they were not required under the Fifth Amendment to offer immunity." *Id.* at 10 (Page ID #4142). It held that the Defendants were entitled to qualified immunity on the Fifth Amendment claims, and dismissed those Defendants whose personal involvement extended only to that claim. *Id.* at 10, 14 (Page ID #4142, 4146).

Both parties now appeal. Defendants argue that the district court erred in denying their motion for summary judgment, because Plaintiffs now concede that they did receive a post-exclusion hearing. The Plaintiffs argue that they were nonetheless denied due process because that hearing was not timely, and the Plaintiffs challenge the district court's holding that the Fifth Amendment right identified in the initial appeal was not clearly established at the time of the violation.

## II. ANALYSIS

### A. Standard of Review

We review de novo a district court's grant or denial of summary judgment on the basis of qualified immunity. *United States v. Ohio*, 787 F.3d 350, 353 (6th Cir. 2015). Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, we must draw all inferences "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

Where a defendant raises the defense of qualified immunity, "it is the plaintiff's burden to show that the defendants are not entitled to qualified immunity." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013). To determine whether qualified immunity applies, this court applies a two-part test and asks: (1) whether the officer violated a constitutional right, and (2) whether that constitutional right was clearly established such that "a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001) (internal quotation marks omitted), *abrogated in part by Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Courts have discretion to decide which of the two parts to apply first. *Pearson*, 555 U.S. at 227.

### B. Defendants' Appeal

#### 1. Law-Of-The-Case Doctrine

Before reaching the merits of the Defendants' appeal, it is necessary that we determine whether review of the procedural due process claims is barred by the law-of-the-case doctrine. "The law-of-the-case doctrine precludes reconsideration of issues decided at an earlier stage of the case." *Caldwell v. City of Louisville*, 200 F. App'x 430, 433 (6th Cir. 2006). The doctrine applies only to issues that were actually decided, whether explicitly or by necessary implication. *Id.* (citing *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 513 n.3 (6th Cir. 2000). It does not extend to issues that should have been raised, or to issues not "fully briefed [or]

squarely decided in an earlier appeal." *Burley v. Gagacki*, 834 F.3d 606, 618 (6th Cir. 2016) (internal quotation marks omitted).

"Importantly, however, [the law-of-the-case] doctrine is intended to enforce a district court's adherence to an appellate court's judgment, and so is applied only loosely when we reconsider our own decisions." *Miller v. Maddox*, --- F.3d ---, No. 17-5021, 2017 WL 3298570, at *2 (6th Cir. Aug. 3, 2017). Therefore, while we generally will not, for prudential reasons, consider issues addressed by a prior panel, the doctrine does not limit our power of review, and we may, in exceptional circumstances, deem it necessary to depart from a prior ruling. *Musacchio v. United States*, 136 S. Ct. 709, 716 (2016); *see also McKenzie*, 219 F.3d at 513 n.3 (noting that the "'law of the case' doctrine is 'directed to a court's common sense' and is not an 'inexorable command'"). We have recognized three exceptional circumstances under which we will consider a previously decided issue: "(1) where substantially different evidence is raised on subsequent trial; (2) where a subsequent contrary view of the law is decided by the controlling authority; or (3) where a decision is clearly erroneous and would work a manifest injustice." *United States v. Rayborn*, 495 F.3d 328, 337 (6th Cir. 2007) (quoting *Westside Mothers v. Olszewski*, 454 F.3d 532, 538 (6th Cir. 2006)).

Here, the Defendants appeal the district court's holding that they were not entitled to qualified immunity on the procedural due process claim. As the district court rightly pointed out, this issue was addressed by a prior panel of this court in *Moody I*, which determined that (1) it was clearly established that the Plaintiffs were entitled to a post-exclusion hearing, (2) the Plaintiffs had not received such hearings, and (3) the Defendants therefore were not entitled to qualified immunity on that claim. *Moody I*, 790 F.3d at 679. Although the district court did not err in holding that *Moody I* had addressed these issues, we find that the parties have identified exceptional circumstances that justify our reconsideration of this issue now on appeal. Specifically, the parties now agree that the Plaintiffs actually received a hearing on their exclusions on April 25, 2013 in response to a request made on November 27, 2012. R. 144 (Defs. Mot. Summ. J. at 20–21) (Page ID #3717–18); R. 156 (Pls. Resp. Defs. Mot. Summ. J. at 9) (Page ID #4035). Because this is a new fact that was not before the prior panel, we believe it is prudent to revisit the question of whether or not a constitutional violation took place.

It is worth noting that the circumstances that justify reconsideration of this issue are indeed extraordinary. Here, despite both parties' failure to raise these arguments in the initial appeal, the parties now agree that different facts govern our review. First Br. at 29; Fourth Br. at 2. These assertions, moreover, are supported by record evidence. R. 85-14 (Nov. 27, 2012 Letter from Counsel at 2) (Page ID #1369); R. 85-13 (Notice of Hr'g at 1) (Page ID #1364). Although these documents were available to the prior panel, neither document states the particular purpose of the hearing. That ambiguity was not resolved until the parties appeared before this panel for oral argument, and counsel clarified that the hearing addressed both the exclusion orders and the license suspensions. Therefore, although the evidence supporting these facts may not be "new," the particular fact before us—that the *exclusion orders* were considered in the April 2013 hearing—is, from our perspective, a new fact.

We will not, however, revisit our prior holding that the right at issue was clearly established, because the parties have put forth no extraordinary circumstances warranting our reconsideration of that claim. We also will not revisit the issue of Defendants Ernst and Lessnau's personal involvement in violating Plaintiffs' procedural due process rights. This claim was raised in the Defendants' initial motion for summary judgment, and therefore was a part of the record before the *Moody I* panel. R. 144 (Defs. Mot. Summ. J. at 8) (Page ID #3705). In fact, as the district court pointed out on remand, the *Moody I* panel specifically identified Ernst as an individual who told Plaintiffs that they could not appeal their exclusion orders. *See Moody I*, 790 F.3d at 679–80. Because there are no new factual claims with respect to Ernst and Lessnau's personal involvement, and no other extraordinary circumstances that warrant our consideration, we decline to reconsider whether these Defendants may be dismissed on the basis that they were not personally involved in the alleged violation.

## 2. Procedural Due Process Claim

The Defendants contend that they are entitled to summary judgment on the procedural due process claim because the Plaintiffs now admit that they received a post-exclusion hearing. First Br. at 29. The Plaintiffs, in response, argue that the April 25, 2013 hearing did not moot their claim, because the hearing was not received within fourteen days of their November 27, 2012 request, as required by Michigan Administrative Code Rule 431.1130(3). Second Br. at

49–50.  Therefore, they argue that they were deprived of a *prompt* post-deprivation hearing.  *Id.* at 50.

Contrary to the Defendants' assertion, due process is not satisfied merely because a hearing took place.  Due process requires that a post-deprivation hearing take place "at a meaningful time and in a meaningful manner."  *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (citation omitted).  With respect to horse racing in particular, the Supreme Court has held that trainers, and presumably drivers, are entitled to a prompt post-deprivation hearing "that would proceed and be concluded without appreciable delay," because "the consequences to a [driver] of even a temporary suspension can be severe."  *Barry v. Barchi*, 443 U.S. 55, 66 (1979).

Here, the exclusion orders were issued on November 30, 2010, and the post-exclusion hearing did not take place until April 25, 2013—nearly two and one-half years after the deprivation took place.  Under these circumstances, it is clear that the Plaintiffs have identified a violation of a clearly established right, and the Defendants are not entitled to summary judgment on the basis of qualified immunity.  We therefore affirm the district court's denial of the Defendants' motion for summary judgment with respect to the procedural due process claim. We remand the case for further proceedings, with the understanding that going forward, it shall be the law of the case that the Plaintiffs received a post-exclusion hearing on April 25, 2013.

## C.  Plaintiffs' Cross-Appeal

### 1.  Fifth Amendment Claim

The Plaintiffs, in their cross-appeal, challenge the district court's holding that the Fifth Amendment right identified in *Moody I* was not clearly established at the time of the violation. "A right is 'clearly established' if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)), *cert. denied*, 136 S. Ct. 1381 (2016).  "In deciding whether a right has been clearly established, the Supreme Court has 'repeatedly' warned lower courts not to define the right at 'a high level of generality.'"  *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 508 (6th Cir. 2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).  However, we have also

recognized that "[a] court need not have previously held illegal the conduct in the precise situation at issue because officials can still be on notice that their conduct violates established law even in novel factual circumstances. *Sutton v. Metro. Gov't of Nashville & Davidson Cty.*, 700 F.3d 865, 876 (6th Cir. 2012) (internal quotation marks omitted).

The right identified in *Moody I* is derived from the Fifth Amendment, which states that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V, § 3. In *Moody I*, we held that the Amendment "entitled the harness drivers to refuse to answer potentially self-incriminating questions, unless the state immunized them from prosecution. To punish the drivers violated the Constitution, and both suspension and exclusion constitute punishment." *Moody I*, 790 F.3d at 673. The right at issue, therefore, was the right to refuse to answer self-incriminating questions without threat of punishment, unless immunity was offered. The Defendants argue that the *Moody I* panel announced "a new requirement that the government expressly offer immunity to state licensees before sanctioning them for refusing to answer regulatory-related questions." Third Br. at 25. Their argument is belied by precedent. In *Lefkowitz v. Turley*, 414 U.S. 70, 78 (1973), the Supreme Court held that "a witness protected by the [Fifth Amendment] privilege may rightfully refuse to answer [potentially self-incriminating questions from his employer] unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant." In other words, "if answers are to be required in such circumstances[,] States *must offer* to the witness whatever immunity is required to supplant the privilege and may not insist that the employee or contractor waive such immunity." *Id.* at 84–85 (emphasis added). That is precisely the right announced in *Moody I*. Therefore, the right was clearly established.

The Defendants nonetheless argue that prior to *Moody I*, an employer was not required to offer immunity because an employee could presume his statements were automatically immune under *Garrity v. New Jersey*, 385 U.S. 493 (1967). In *Garrity*, the Supreme Court held that where a public employer "use[s] the threat of discharge to secure incriminatory evidence against an employee," the Fifth Amendment prohibits the use of such incriminating evidence in a subsequent criminal proceeding. 385 U.S. at 499–500. We do not find the Defendants' argument persuasive. First, prior cases indicate that *Garrity* immunity may not necessarily be

coextensive with "whatever immunity is required to supplant the privilege." *Turley*, 414 U.S. at 84–85. For example, as noted in *Kastigar v. United States*, 406 U.S. 441, 458 (1972), the Fifth Amendment protects against the use and the *derivative* use of coerced statements at trial. That grant of immunity exceeds the grant articulated in *Garrity*.

Second, the Defendants' argument undermines the clear language of subsequent cases that articulate the specific right at issue here. The Supreme Court in *Turley* articulated a separate Fifth Amendment right that applies when potentially self-incriminating questions are posed in a public-employment setting. *Turley*, 414 U.S. at 78. Although that right is not absolute, it is clear that under some circumstances a public employee must be able to invoke that privilege without fear of punishment. *See id*. at 77 (holding that the Fifth Amendment "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings"); *Gardner v. Broderick*, 392 U.S. 273, 276 (1968) ("Our decisions establish beyond dispute the breadth of the privilege to refuse to respond to questions when the result may be self-incriminatory, and the need to fully implement its guaranty"). The key question, for our purposes, is when that privilege can be invoked. *Turley* provides us with an answer, and instructs that the privilege may be enjoyed "unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant." 414 U.S. at 78. To assume, as the Defendants would have us do, that immunity applied automatically is to say that there is no right at all.

Moreover, the Defendants fail to recognize that the right articulated in *Turley* is separate and distinct from the one articulated in *Garrity*, one which carries separate entitlements, protects against different infringements by the government, and, importantly, one whose contours are shaped by very different considerations. Immunity under *Garrity* has direct and obvious criminal implications that require the right to be absolute. *See Garrity*, 385 U.S. at 500 ("There are rights of constitutional stature whose exercise a State may not condition by the exaction of a price.") Although the right at issue here and in *Turley* involves potential criminal consequences, it is more directly related to an individual's interest in public employment, which must be

balanced against the public interest in obtaining information to "to assure the effective functioning of government." *Turley*, 414 U.S. at 81 (citation omitted). These countervailing considerations color the contours of the right and impose a different set of procedural steps that are intended both to preserve the privilege against self-incrimination, but also to allow the state to compel testimony to ensure the effective administration of government. *See Kastigar*, 406 U.S. at 444–45. As *Turley* makes clear, making an offer of immunity is one such procedural step. *Turley*, 414 U.S. at 84–85.

*Garrity* immunity prohibits the use of coerced statements in criminal proceedings, but it does not protect against the act of coercion itself. The Supreme Court in *Turley*, *Gardner*, and *Kastigar* recognized that the act of coercion itself is a public action that threatens the Fifth Amendment in a markedly different way than does the use of a coerced statement in a criminal proceeding. Therefore, "a State may not impose substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself." *Lefkowitz v. Cunningham*, 431 U.S. 801, 805 (1977). Given the Supreme Court's recognition that the privilege against self-incrimination "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory," *Kastigar*, 406 U.S. at 444, the Court has recognized a separate right for individuals to refuse to answer in civil proceedings, the contours of which are separate from the immunity articulated in *Garrity*.

Finally, we reject the Defendants' argument that the circumstances here are distinguishable from cases where employees were explicitly asked to waive their right to immunity. *See Turley*, 414 U.S. at 82; *Cunningham*, 431 U.S. at 805–06. The record demonstrates that the Plaintiffs were suspended and excluded solely on the basis of Michigan Administrative Code Rule 431.1035, which requires an applicant for an occupational license to cooperate in every way during the course of an investigation, including by responding to all questions. *See* R. 18–9 (Stewards Hr'g Ruling) (Page ID #254–57); R. 85–16 (Ernst Letters) (Page ID #1377–79); Mich. Admin. Code R. 431.1035. These circumstances are substantially similar to the circumstances in *Turley*, where state law provided that a failure to cooperate or answer questions was grounds for disqualifying a state contractor's contracts. *Turley*, 414 U.S. at 71, 82. Indeed, the Court in *Turley* recognized that "[t]he waiver sought by the State, under

threat of loss of contracts, would have been no less compelled than a direct request for the testimony without resort to the waiver device." *Id.* at 82. Here, the administrative rule, as applied, left Plaintiffs with only two choices: to waive their privilege and cooperate with an investigation, or to be punished. The Supreme Court has clearly held this choice to be coercion, which constitutes an illegal action until an offer of immunity is made.

Under the conditions articulated with respect to the particular right at issue, a public employee "may rightfully refuse to answer *unless and until* he is protected at least against the use of his compelled answers." *Turley,* 414 U.S. at 78 (emphasis added). The Supreme Court has made clear that if a state wishes to punish an employee for invoking that right, "States must offer to the witness whatever immunity is required to supplant the privilege and may not insist that the employee or contractor waive such immunity." *Id.* at 85. We therefore reverse the district court's grant of qualified immunity on the Fifth Amendment claim, and hold that the right articulated in *Moody I* was clearly established at the time of the violation.

### 2. Motion to Reopen Discovery and Amend the Complaint

The Plaintiffs also appeal from the district court's denial of their motion to reopen discovery, motion to compel discovery, and motion to amend the complaint. These claims are not properly before us. The district court has not entered a final judgment in this case, nor has it certified any of these claims for immediate appeal pursuant to Federal Rule of Civil Procedure 54(b). These claims therefore exceed our jurisdiction.

### III. CONCLUSION

Based on the foregoing, we **AFFIRM** the denial of qualified immunity on the procedural due process claim, **REVERSE** the grant of qualified immunity on the Fifth Amendment claim, and **REMAND** the case for further proceedings.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

ALICE M. BATCHELDER, Circuit Judge, concurring in part and dissenting in part. I agree with the majority—albeit for different reasons—that the district court did not err by holding that there is a material dispute of fact over whether there was a constitutional violation on the drivers' procedural due process claim. I part ways with the majority on its analysis of the Fifth Amendment claim and would affirm the district court's grant of qualified immunity. Accordingly, I respectfully concur in part and dissent in part.

**I.**

I begin with the majority's treatment of the drivers' post-exclusion procedural due process claim. On a motion for summary judgment, a plaintiff who brings a § 1983 action against a government official bears the burden of overcoming the qualified immunity defense by showing that (1) the defendant violated a constitutional right and (2) that right was clearly established. *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680–81 (6th Cir. 2013). When we previously resolved an appeal in this case, we held that the drivers were "due the process of 'a prompt postsuspension hearing,'" which the drivers had received. *Moody v. Mich. Gaming Control Bd.*, 790 F.3d 669, 679 (6th Cir. 2015) ("*Moody I*") (quoting *Barry v. Barchi*, 443 U.S. 55, 66 (1979)). We also held that the drivers had the same right following their exclusions, applying the principles that a person is due "some kind of hearing . . . at some time before . . . [being] finally deprived of his property interests" and that "the *suspension* of a jockey's license entitles him to a post-deprivation hearing." *Id.* at 677, 679 (extending *Wolff v. McDonnell*, 418 U.S. 539, 557–58 (1974), and *Barry*, 443 U.S. at 66, to hold that a harness driver has a right to post-exclusion due process).

For purposes of my analysis, I assume that the right was clearly established.[1] Although I agree with the majority that the district court did not err by holding that there are material,

---

[1]In *Moody I*, we held that a driver is "due the process of a postexclusion hearing" by extending *Barry* to cover "exclusions" in addition to "suspensions." During that discussion, we did not discuss whether the law was

disputed facts concerning whether there was a constitutional violation here, I cannot subscribe to the majority's rationale. The majority allows the drivers to modify their claim from one of no-due-process to one of untimely-due-process. It does so by relying on the law-of-the-case doctrine, which I find unnecessary. I would find that the drivers survive summary judgment on their post-exclusion due process claim on the basis of *Moody I*, as well as the standards governing summary judgment.

The rationale of *Moody I*'s holding was that *if* the drivers had requested a post-exclusion hearing through their license applications, then MGCB violated the drivers' due process right by denying them a post-exclusion hearing. *Moody I*, 790 F.3d at 679 (holding that the drivers would fail on this due process claim "*if* they had failed to request a hearing" (emphasis added)). Accordingly, we remanded "to the district court for further proceedings on [whether] the harness drivers request[ed] hearings on their exclusions." *Id.* at 681. The implication in our prior opinion was that the drivers were obliged to adduce further evidence on remand to demonstrate that the drivers had, in fact, requested a hearing. Instead, confronted with the fact that they had received a hearing on their exclusions, the drivers changed rein to focus on whether that hearing was timely, while MGCB focused on whether the drivers had requested a hearing in the first place.

To unravel this knot, I turn to the standards applicable in a summary judgment proceeding and on an appeal of such a proceeding. MGCB moved for summary judgment on this issue, so the drivers were obliged to produce more than a "mere scintilla of evidence" to

---

clearly established, but our remand order asked the district court to consider whether the drivers' "due-process claims involve[d] clearly established rights." 790 F.3d at 679, 681. On remand, the district court explained that whether the "post-exclusion due process rights were clearly established" was not up for debate, citing Michigan law. The majority in this appeal treats *Moody I* as if we held that the right was clearly established in spite of the remand instruction. *Moody I*'s analysis of the right at issue implied that the leap from suspensions to exclusions was not a large one. In some cases, the extension of a principle can satisfy our duty to determine whether a right was clearly established. *Cf. Comstock v. McCrary*, 273 F.3d 693, 711 (6th Cir. 2001) ("[W]e need not find a case in which 'the very action in question has previously been held unlawful,' but, 'in the light of pre-existing law, the unlawfulness must be apparent.'" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (brackets omitted))). I question whether the right was clearly established prior to *Moody I*, but I understand why the majority found that *Moody I* determined the right was clearly established. If we were to consider this issue, I would examine the differences under Michigan law between suspensions and exclusions, the effect of our opinion in *Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 739 (6th Cir. 1980), and why the district court's citation to state law alone is likely insufficient to "be the basis for a federal constitutional violation" pursuant to *Smith v. City of Salem, Ohio*, 378 F.3d 566, 578 (6th Cir. 2004).

demonstrate that there was a genuine issue of material fact. *Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 577 (6th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). We view the evidence and draw any inferences in the light most favorable to the drivers. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). And because MGCB appeals the denial of its qualified-immunity-based motion for summary judgment, we review the legal issues and decline to review the sufficiency of the factual allegations. *DiLuzio v. Vill. Of Yorkville, Ohio*, 796 F.3d 604, 609 (6th Cir. 2015).

MGCB produced a bevy of evidence—some of which was new—to support its argument that it had not construed the drivers' license applications as appeals of the exclusion orders. But because MGCB moved for summary judgment and now appeals the denial of its motion, we are less concerned with the evidence it adduced than with the drivers' response to the motion. Indeed, we make no factual findings. The district court relied on *Moody I* to hold that there is a genuine dispute of material fact, so that is what we review. The onus was on the drivers to demonstrate more than a mere scintilla of evidence in support of their claims. On that point, they had formidable assistance in the form of *Moody I*'s pronouncement that "[a] reasonable juror might conclude that the MGCB should have construed those applications as requests for the hearings due to them under the federal constitution and state regulations" and its citation to the Ernst Letter. 790 F.3d at 680. On remand, the drivers relied on this explanation, as well as letters from Al Ernst and Erik Pedersen, both employees of MGCB, to argue that it was "undisputed" that the drivers requested a hearing on their exclusions. On appeal, they argue that it "cannot be seriously disputed that [they] requested hearings on the exclusion orders." Without our prior opinion, I would find it necessary to reject these claims, because MGCB has done quite a bit to show that there is a dispute over this issue. But my conclusion must be tempered by our prior opinion. On the evidence before the court, *Moody I* explained that a juror could find that MGCB should have construed the license applications as appeals of the exclusion orders. When it remanded the case for further proceedings, it did not explain that the drivers necessarily had an obligation to adduce further evidence to establish its claim and satisfy its burden on summary judgment. The drivers took this to mean that we had found this to be an undisputed fact.

The drivers offered the same evidence before both the *Moody I* panel and us. I am satisfied that the drivers should survive summary judgment at this point, because we view the evidence and draw inferences in their favor. Although they failed to produce any additional evidence, *Moody I*'s holding gives the drivers enough of an edge to carry their burden at summary judgment now. MGCB's evidence is "no bum steer"[2] and may well carry the day before a jury. But I cannot agree that the drivers have failed to meet their burden such that we can condone a grant of summary judgment in favor of MGCB.

I would affirm the denial of qualified immunity on the procedural due process claim for these reasons. Accordingly, I concur in the majority's affirming the order of the district court.

**II.**

**A.**

Turning to the majority's analysis of the Fifth Amendment privilege against self-incrimination, I respectfully dissent. In a qualified immunity case, the clearly established analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *abrogated in part by Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "[W]e need not find a case in which 'the very action in question has previously been held unlawful,' but, 'in the light of pre-existing law, the unlawfulness must be apparent.'" *Comstock*, 273 F.3d at 711 (brackets omitted) (quoting *Anderson*, 483 U.S. at 640). To evaluate the contours of the right, "we must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 606 (6th Cir. 2006) (internal quotation marks omitted). Although the Supreme Court "'does not require a case directly on point' for a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (internal brackets and quotation marks omitted) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)).

---

[2]*Cf.* Frank Loesser, *Fugue for Tinhorns, on* Guys & Dolls (Original Broadway Cast Recording) (Decca 2000) (1950).

At "a high level of generality," *id.* at 552 (citation omitted), a public employee or, in this case, a licensee may refuse to answer questions that may tend to incriminate himself unless and until he has immunity from prosecution on the basis of his answers to the State's questions. *Moody I* was correct to explain that "'a governmental body may not require an employee to waive his privilege against self-incrimination as a condition to keeping his job . . . even [when] no criminal proceedings were ever instituted against' an employee who was later successful in constitutional claims." *Moody I*, 790 F.3d at 674 (alteration in original) (quoting *Lingler v. Fechko*, 312 F.3d 237, 239 (6th Cir. 2002)).

I part ways with the majority, however, because it does not—and cannot—point to "clearly established law [that is] 'particularized' to the facts of [this] case." *White*, 137 S. Ct. at 552 (quoting *Anderson*, 483 U.S. at 640). The majority finds clearly established *Moody I*'s holding that MGCB violated the drivers' rights when it "did not offer [them] immunity before the hearing." *Moody I*, 790 F.3d at 674. Based on my understanding of the Supreme Court's precedent, I cannot agree. Moreover, the majority fails to grapple with binding precedent from our circuit that undermines its holding that the right at issue was clearly established. *See Lingler*, 312 F.3d at 239–40 (holding that it was not a constitutional violation for a police chief to exact statements from police officers concerning their employment when they were not required to waive their privilege against self-incrimination and the statements were not used against them in a criminal proceeding).

The majority finds that the right at issue was clearly established on the basis of *Lefkowitz v. Turley*, 414 U.S. 70, 78 (1973), which, in its view, defined "precisely the right announced in *Moody I*." There, the Supreme Court reviewed New York state laws requiring the State to cancel contracts and disqualify contractors from future State contracts when a contractor "refuses to waive immunity or to answer questions when called to testify." *Id.* at 71–72. Two licensed architects subject to these laws "were summoned to testify before a grand jury," where the architects refused to sign waivers of immunity. The district attorney thereafter notified the contracting agencies of the architects' refusal to waive their immunity, and the architects brought an action seeking to declare New York's statutes unconstitutional. The Supreme Court explained that "a witness protected by the privilege may rightfully refuse to answer unless and until he is

protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant." *Id.* at 78 (citing *Kastigar v. United States*, 406 U.S. 441 (1972)). It also analyzed the animating policy behind this line of cases:

> [The cases] ultimately rest on a reconciliation of the well-recognized policies behind the privilege of self-incrimination, and the need of the State, as well as the Federal Government, to obtain information to assure the effective functioning of government. Immunity is required if there is to be rational accommodation between the imperatives of the privilege and the legitimate demands of government to compel citizens to testify.

*Id.* at 81 (internal citations and quotation marks omitted); *see also id.* at 84 ("Although due regard for the Fifth Amendment forbids the State to compel incriminating answers from its employees and contractors that may be used against them in criminal proceedings, the Constitution permits that very testimony to be compelled if neither it nor its fruits are available for such use."). This policy ensures that governments are able to maintain integrity through investigations, but this comes at a cost—the government may not use testimony gathered as part of such an investigation to prosecute a participant in that investigation.

It is not until the very end of *Turley* that one sees any language implying that the state must offer immunity.

> But the State may not insist that appellees waive their Fifth Amendment privilege against self-incrimination and consent to the use of the fruits of the interrogation in any later proceedings brought against them. Rather, the State must recognize what our cases hold: that answers elicited upon the threat of the loss of employment are compelled and inadmissible in evidence. Hence, if answers are to be required in such circumstances *States must offer to the witness whatever immunity is required to supplant the privilege* and may not insist that the employee or contractor waive such immunity.

*Id.* at 84–85 (emphasis added). The majority emphasizes the italicized language in this quotation, but, in context, it is clear why it was necessary in *Turley*. New York had required the architects both to sign a waiver of their Fifth Amendment rights and to consent to the use of their testimony in a subsequent prosecution, and all of this occurred when the architects were before the grand jury. Such is not the case here. The hearing we are concerned with was before a racing regulator, and the drivers do not suggest that the regulator had either the power to bring a criminal proceeding against them or to immunize them from prosecution without the

involvement of a prosecutor. Nor have the drivers pointed to anything in the record suggesting that MGCB asked them to sign away their Fifth Amendment rights. Indeed, unlike the New York law at issue in *Turley* that explicitly required the architects to waive their immunity, the Michigan law requiring compliance with an investigation does not condition licensure on the waiver of the right. The drivers certainly did not lose their Fifth Amendment rights in this hearing, and could reasonably fear their answers might be used against them in a subsequent prosecution. But we have held that the mere "threat of disciplinary action" does not create an implicit waiver of the privilege against self-incrimination. *See Lingler*, 312 F.3d at 239 ("[T]he officers contend that a waiver of the privilege is implicit in any statement given by a public employee under threat of disciplinary action. The caselaw does not support this contention—and . . . any such waiver would have been ineffective."). In light of these key distinctions, I cannot agree that *Turley* clearly established the right in question here.

I acknowledge that a threat of termination can be coercion that violates the Fifth Amendment, *see Turley*, 414 U.S. at 80–83, and the drivers' Fifth Amendment rights are not watered down in such a situation. *See Lefkowitz v. Cunningham*, 431 U.S. 801, 805–06 (1977) ("[O]ur cases have established that a State may not impose substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself."). But the applicable precedent is not so simple. *See id.* at 806 ("Public employees may constitutionally be discharged for refusing to answer potentially incriminating questions concerning their official duties if they have not been required to surrender their constitutional immunity."). It requires us to parse out the nature of the investigation and the source of the threat of termination. In *Gardner v. Broderick*,

> If appellant, a policeman, had refused to answer questions specifically, directly, and narrowly relating to the performance of his official duties, without being required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself[,] the privilege against self-incrimination would not have been a bar to his dismissal.
>
> The facts of this case, however, do not present this issue. Here, petitioner was summoned to testify before a grand jury in an investigation of alleged criminal conduct. He was discharged from office, not for failure to answer relevant questions about his official duties, but for refusal to waive a constitutional right. He was dismissed for failure to relinquish the protections of the privilege against

> self-incrimination. The Constitution of New York State and the City Charter both expressly provided that his failure to do so, as well as his failure to testify, would result in dismissal from his job. He was dismissed solely for his refusal to waive the immunity to which he is entitled if he is required to testify despite his constitutional privilege.

392 U.S. 273, 278 (1968) (citations and footnote omitted). *Gardner* distinguishes between situations in which a public employee is asked questions concerning performance of his duties and those in which the State asks him to waive his immunity. A threat of termination in the former is clearly permissible, whereas immunity must accompany such a threat in the latter. Here, it is not clear that the Steward's Hearing was tantamount to a proceeding before the grand jury in which a witness must waive the privilege against self-incrimination. The Steward's Hearing addressed allegations about the drivers' possible involvement in race-fixing, which directly relates to the public license they held. This falls within the first scenario contemplated by *Gardner*. As for the second *Gardner* scenario, there was no grand jury and there was no request that the drivers sign away their constitutional rights. Therefore, *Gardner* cannot be the basis for determining whether this right was clearly established, because the threat of termination following the Steward's Hearing could have been permissible if it was "narrowly relating to the [drivers'] performance" as state licensees. *Gardner*, 392 U.S. at 278.

I cannot agree that *Turley*, *Gardner*, and like cases provide the proper lens through which we should assess this case for purposes of qualified immunity. These cases address different situations from the one here. The question, then, is whether MGCB needed to "offer" immunity in the form of notifying the drivers that their testimony could not be used against them. This is where *Garrity*, which is the progenitor of the other cases I have discussed so far, fits into the picture.

**B.**

In *Garrity*, the Supreme Court held that a statement obtained under the coercive threat of removal from office violates the Constitution. *See Garrity v. New Jersey*, 385 U.S. 493, 499 (1967). And in a companion case to *Garrity*, the Supreme Court explained the constitutional problem as requiring employees to choose "between surrendering their constitutional rights or their jobs," but holding that employees would "subject themselves to dismissal if they refuse to

account for their performance of their public trust, after proper proceedings, which do not involve an attempt to coerce them to relinquish their constitutional rights." *Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation*, 392 U.S. 280, 284–85 (1968). Courts have construed *Garrity* as effectively immunizing a public employee's or licensee's statements from being used against her in a subsequent prosecution by explaining that such statements would be rendered inadmissible in such a prosecution.[3] *See Lingler*, 312 F.3d at 239. In fact, even in *Turley*, the Supreme Court construed *Garrity* to mean that if evidence was obtained in violation of the principle that a party may not be forced to waive her immunity, "any answers elicited [would be] inadmissible." *Turley*, 414 U.S. at 80–81 (citing *Garrity*, 385 U.S. at 499–500); *cf. Lingler*, 312 F.3d at 240 (explaining that the law does not support the contention that "a waiver of the privilege is implicit in any statement given by a public employee under threat of disciplinary action" and that under *Garrity*, "any such waiver would have been ineffective").

Interpreting *Garrity* to mean that coerced testimony cannot be used in a subsequent criminal proceeding, however, leaves an important question unanswered: is that effect of the Fifth Amendment privilege against self-incrimination a self-executing one, or must the public employer or agency affirmatively make its employee, contractor, or licensee aware of the immunity that *Garrity* affords? In *Moody I*, we concluded that MGCB had an affirmative obligation to notify the drivers that they were afforded immunity in exchange for being threatened with the loss of their licenses. In effect, we created a prophylactic rule, but this rule had not been in place before. The district court was therefore correct when it explained that "[w]hat was not clearly established in this Circuit [before *Moody I*] was whether the State was required to *offer* immunity in the first place." *Moody v. Mich. Gaming Control Bd.*, 202 F. Supp. 3d 756, 760 (E.D. Mich. 2016).

---

[3]The majority finds that "*Garrity* immunity may not necessarily be coextensive with 'whatever immunity is required to supplant the [Fifth Amendment] privilege.'" Maj. Op. at 11 (quoting *Turley*, 414 U.S. at 84–85). It further notes that in *Kastigar v. United States*, 406 U.S. 441, 458 (1972), the Supreme Court held that the Fifth Amendment protects against the use and the derivative use of coerced statements at trial and that this "exceeds the grant articulated in *Garrity*." Maj. Op. at 11. Even if they are right that *Kastigar*'s view of immunity exceeds *Garrity*'s, this is a question for another day. Here, we are not concerned with evidence—direct, derivative, or otherwise—that was presented to a jury, so we have no occasion to determine whether *Garrity* would render some such hypothetical evidence inadmissible but allow other hypothetical evidence to be admitted.

This is the proper lens through which to analyze this case, so I cannot find that the right had been clearly established before *Moody I*. The Supreme Court has not directly addressed how this right plays out in non-prosecutorial administrative proceedings, as I discussed above. Nor has our circuit addressed this previously. And looking to the other circuits demonstrates precisely why I cannot find that the right announced in *Moody I* was clearly established, for it is the subject of a circuit split among the various United States Courts of Appeals. *See, e.g.*, *Sher v. U.S. Dep't of Veterans Affairs*, 488 F.3d 489, 503 (1st Cir. 2007) ("The circuits have taken different approaches to the issue of whether a government employer is required to provide such notice to an employee."); *compare, e.g.*, *Atwell v. Lisle Park Dist.*, 286 F.3d 987, 990 (7th Cir. 2002) ("Our court has ruled in several cases that the government employer who wants to ask an employee potentially incriminating questions must first warn him that because of the immunity to which the cases entitle him, he may not refuse to answer the questions on the ground that the answers may incriminate him."), *with Hill v. Johnson*, 160 F.3d 469, 471 (8th Cir. 1998) ("[T]he mere failure affirmatively to offer immunity is not an impermissible attempt to compel a waiver of immunity."). This split of authority, although not acknowledged by the majority, supports my conclusion that the law was not clearly established prior to *Moody I*. To saddle MGCB with the unjustified holding that this issue was clearly established before *Moody I* runs counter to the qualified immunity doctrine. I therefore respectfully dissent.