RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0001p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

NATIONWIDE RECOVERY, INCORPORATED; JULIA
HUSSEIN; HUSSEIN M. HUSSEIN; JERRY PARKER; ANNIE
HUSSEIN; LOUAY M. HUSSEIN; CAROL HENDON,

          *Plaintiffs-Appellants*,

    *v.*

CITY OF DETROIT, MICHIGAN,

          *Defendant-Appellee*.

No. 24-1401

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Flint.
No. 4:17-cv-12378—Linda V. Parker, District Judge.

Argued:  May 8, 2025

Decided and Filed:  January 7, 2026

Before:  STRANCH, BUSH, and NALBANDIAN, Circuit Judges

───────────────

## COUNSEL

**ARGUED:**  Marc A. Deldin, DELDIN LAW, PLLC, Grosse Pointe Farms, Michigan, for
Appellants.  Nathan J. Fink, FINK BRESSACK, Bloomfield Hills, Michigan, for Appellee.  **ON
BRIEF:**  Marc A. Deldin, DELDIN LAW, PLLC, Grosse Pointe Farms, Michigan, for
Appellants.  Nathan J. Fink, David H. Fink, FINK BRESSACK, Bloomfield Hills, Michigan, for
Appellee.

───────────────

## OPINION

───────────────

    NALBANDIAN, Circuit Judge.  Nationwide Recovery had a towing permit with the City

of Detroit.  Under that permit, Nationwide could charge for recovering stolen vehicles.  So it was

to the company's economic advantage to know where car thieves would stash vehicles after stripping them for parts. But the City suspected that at least one of Nationwide's tow operators was bribing car-theft gangs for tips. Based on these suspicions, the City suspended the company's tow permit without a hearing. In response, Nationwide sued the City, alleging a procedural due process violation. The district court held that the company had been deprived of its property interest without the required hearing, and it allowed additional discovery and briefing on damages. After almost five more years of litigation, the district court concluded that Nationwide was only entitled to nominal damages. Because the termination of Nationwide's permit was justified, we affirm.

## I.

Like thousands of other law-enforcement agencies, the Detroit Police Department (DPD) relies on private companies to perform towing services. And at the time, the City of Detroit allowed its Board of Police Commissioners to set standards for towing companies to qualify for a permit. Detroit City Code § 55-15-8(a) (2014). Once granted, permits were nontransferable and lasted five years. R.41-9, Towing Rules, pp.10–11, PageID 1552–53. But the City retained "the right to terminate any towing permit" if the company breached the rules, such as by "charging any fee or cost in excess of that specifically authorized by the City." *Id.* at pp.5, 10, PageID 1547, 1552. Still, the rules required the Board to hold a hearing before the City terminated a permit. In a similar vein, the City could terminate any permit—without a pretermination hearing—for fraud or criminal conduct by the company or its employees. Even so, a post-termination hearing was needed to review the allegations.

## A.

In 2011, Nationwide Recovery applied for, and received, a DPD towing permit. And the company renewed the permit in May 2016. It was after this renewal that the City got serious about investigating towing company misconduct generally. In July 2017, then-Assistant Chief James E. White of the DPD emailed then-Lieutenant Michael Parish and Shelley Holderbaum, stating that "*any* and *all* complaints of misconduct" about authorized tow companies should be

directed to Michael Parish, who would lead the investigation.[1]  R.148-6, Towing Compls. Email, p.1, PageID 4877.  Depending on the investigation's outcome, White would decide whether to present the Board with "a recommendation for suspension of the company."  *Id.*

The next day, Parish sent White a preliminary report about the theft of a white Jeep Cherokee, which implicated Nationwide.  The report noted that "[f]or at least the last year, Nationwide has had the reputation of recovering stolen vehicles at an alarming rate," leading the DPD to suspect that the company was complicit in the thefts.  R.148-5, Parish Mem., p.2, PageID 4871.  And yet prior attempts at surveillance had not uncovered any "clear evidence" of the company's involvement in the thefts.  *Id.* at p.3, PageID 4872.  Still, Nationwide's outsized participation in the DPD's stolen-car initiative concerned officers.

The breakthrough came when the DPD received a timestamped video recording of the theft of the Jeep Cherokee, captured on July 15, 2017, at 7:05 a.m.  This was relevant because Nationwide's tow records revealed that the company had recovered that same vehicle at 7:19 a.m.—a mere fourteen minutes after the theft.  Those same records also showed that the vehicle had been stripped of its tires by the time Nationwide recovered it.  And Officer McMahon, whom Nationwide listed as the officer requesting the tow, had not been working at the time of the theft.[2]  Without any officer to clue Nationwide into the theft, Parish concluded "that the vehicle could only have been stolen, partially stripped, and recovered within" fourteen minutes if "Nationwide had participated in the theft."  *Id.* at p.5, PageID 4874.  For that reason, Parish recommended that the DPD immediately suspend and terminate Nationwide's permit because of its suspected complicity in the thefts.

---

[1]The timing of this email was hardly coincidental.  In May 2017, the federal government indicted Gasper Fiore, a Detroit towing magnate who owned one of the most prominent permitted towers, for bribery.  This raised the specter of public corruption in the City's towing program—though that specific indictment was unrelated to the DPD towing permits.  *See Boulevard & Trumbull Towing, Inc. v. City of Detroit*, No. 352503/353099, 2021 WL 5405759, at *1 (Mich. Ct. App. Nov. 18, 2021).

[2]As part of state court litigation also related to Nationwide's towing for DPD, Officer James McMahon "acknowledged [that] over several years there were recoveries where no officers were present."  R.211-5, State Ct. Op., p.19, PageID 6682.  McMahon said that he would just receive "photos and clear the tow company to remove the vehicle to the tow yard."  *Id.*

After receiving Parish's memo, White sent a concurring message to DPD Chief James E. Craig advocating for Nationwide's immediate suspension.  He also recommended that the DPD refer the matter to the Public Corruption Unit and "give the Board of Police Commissioners a report at its next scheduled meeting."  R.154-2, White Mem., p.3, PageID 5277.  So on July 19, 2017, Parish and White issued an administrative message removing Nationwide "from all department tow rotations" and prohibiting DPD members "from contacting Nationwide . . . for police-related towing services."  R.148-2, Admin. Message, p.2, PageID 4777.

At the next scheduled meeting, White updated the Board about Nationwide's possible criminal conduct and the suspension.  And the Board recognized that, under their internal operating rules, Nationwide should be afforded a hearing "as soon as practical."  R.148-4, White Dep., p.93, PageID 4814.  But on August 9, 2017, the Detroit Law Department issued a memo stating the City's official position:  that the DPD lacked "legal authority to" issue any towing permits.[3]  R.24-3, Law Dep't Mem., p.1, PageID 503.  In short, the City argued that all permits issued in 2016 "were null and void ab initio, and no tow company had or has any property right or interest in any purported permit."  *Id.*  So the Board saw no reason to conduct the post-deprivation hearing on Nationwide's suspension.  After all, they couldn't reinstate Nationwide's permit if that permit had never been valid in the first place.

But even though the City no longer felt that it needed to host a hearing on the permit termination, the DPD continued to believe investigations into public corruption and possible criminal conduct were necessary.  As a result, Lieutenant John Kennedy of the Public Corruption Unit in DPD Internal Affairs began investigating Nationwide for corrupt practices.  After reviewing the evidence, Kennedy concluded that Nationwide "didn't do anything."[4]

---

[3]The City advanced three arguments for why all permits issued since 2011 were void.  First, the City claimed that state law required "all financial and budget activities" to be overseen by the City's Chief Financial Officer, who hadn't been involved in granting these permits.  R.24-3, Law Dep't Mem., p.1, PageID 503.  Second, the City noted that since its exit from bankruptcy in 2014, state law required the city to obtain approval for long-term contracts from the Michigan Financial Review Commission, who had not approved the tow permits.  And third, the City noted that its Charter required either City Council or Corporation Council approval for any contracts, which had not been given for these permits.  The City reasserted these arguments when Nationwide sued.  But the district court rejected each, holding that "[n]one of the statutes or charter provisions the City relies upon invalidate" the permits.  *Nationwide Recovery, Inc. v. City of Detroit*, 336 F. Supp. 3d 790, 798 (E.D. Mich. 2018).

[4]That said, Kennedy's review of the materials was hardly rigorous.  Certain statements he made during his deposition make clear that he didn't read the White and Parish memoranda and so didn't understand their

R.154-1, Kennedy Dep., p.26, PageID 5261.   And the internal affairs investigation was inconclusive about Nationwide's involvement with the July 15 theft.

But the end of this internal affairs investigation didn't signal the end of the related criminal investigation.   Parish continued to suspect that Nationwide or its employees were colluding with car thieves.   Even though Nationwide no longer towed cars under the DPD permit, they still retained permits with other law enforcement agencies in the Detroit metropolitan area.[5]   And so the post-termination investigation into Nationwide's criminal collusion focused on tows conducted under those permits.   As this criminal investigation unfolded, two incidents bolstered Parish's suspicion that Nationwide and at least one of its employees had a direct connection with known car thieves.

The first involved Nationwide's towing of a car on July 28, 2017—less than ten days after the suspension of the company's DPD permit.   Officers surveilling a known gang of car thieves saw Nationwide driver Kenneth "Turbo" Christian arrive to recover a car within five minutes of it being stolen.   In essence, the gap between the theft and Nationwide's recovery was so short that there was no way it could have happened naturally.   So Parish saw the episode as proof "that Christian had received a tip from one of the thieves."   R.211-2, Parish Decl., p.7, PageID 6591.

If any doubt remained, a second incident in October 2017 confirmed the DPD's suspicion that Nationwide was colluding with the thieves.   Officers raided a location used by the car thieves and confiscated a phone belonging to one of its members—Maurice Leggete-Cochran.[6]

---

allegations.  For example, one of his reasons for clearing Nationwide of wrongdoing was that the video didn't show the Nationwide tow truck steal the Jeep Cherokee out of the driveway.  And yet the memos supporting Nationwide's suspension stated that Nationwide hadn't stolen the vehicle itself.  But its driver had recovered the car so quickly as to make their collusion with the thieves all but certain.  Also, Kennedy himself later pleaded guilty to conspiracy to commit bribery—specifically to conspiring to use his position as a supervisor to persuade other officers to accept bribes from tow companies for preferential treatment.

[5]Nationwide was still authorized to recover stolen cars under a separate program run by the Wayne County Sheriff's Office.  The Sheriff's Office has jurisdiction across all of Wayne County—including within the city of Detroit, where it shares policing responsibility with the DPD.

[6]Cochran had been identified as driving the same car—a purple Pontiac Sunfire—that was used to steal the Jeep Cherokee on July 15, 2017—the same incident that prompted Nationwide's termination.  Though not conclusive, this fact indicates that the same gang conducted both the July 15 and July 28 thefts where Nationwide recovered the stolen vehicle in a suspiciously quick fashion.

A forensic search of the phone revealed "voluminous communications" between Cochran and Christian. R.211-2, Parish Decl., p.8, PageID 6592. These texts strongly implied that Christian had paid Cochran for tips on where the gang was dumping cars after they had been stolen and stripped. For instance, Christian texted Cochran to "Come back n get ur $ dillhole" and that it was time to "Do sum work twinkle toes." R.211-14, Text Messages, pp.2–3, PageID 6776–77. Even though Cochran was in police custody when Christian sent some of these messages, their incriminating content implied that Christian was paying car thieves for locations of vehicles. And this relationship is what allowed Christian to recover the vehicles mere minutes after they were stolen.

Eager to be reinstated in the towing rotation, Nationwide reached out to Parish about the criminal investigation. To clear its name, Nationwide offered to have Christian come in for a voluntary interview. And so on March 2, 2018, Christian—accompanied by both his own criminal counsel and Nationwide's civil counsel—met with Parish for a recorded interview. Christian admitted that he had been communicating with the car thieves but that "they never asked for money." R.211-2, Christian Dep., p.17, PageID 6639. He also said that because his supervisor told him to stop taking tips from thieves, he had stopped texting them in August 2017. And yet Christian claimed that he could not provide phone records to corroborate his account because he "deleted text messages on a daily basis" to keep them from "taking up memory in [his] phone." *Id.* at 27, PageID 6641. When confronted with the forensic text records from Cochran's phone showing that Christian had continued texting him through October 2017, Christian and Nationwide's attorneys ended the interview.

Given the mounting evidence of criminal conduct, Parish reviewed other allegations of misconduct against the company. Even before the July 2017 suspension, Parish had received anecdotal complaints about Nationwide charging excessive fees.

The Board's Towing Rules set the fees that authorized tow operators could charge, prohibiting anything beyond those amounts. So an operator could charge $125 for towing vehicles under 10,000 pounds (almost all personal cars fall into this category), a $75 administrative fee that would be remitted to the City, and a storage fee capped at $15 per day.

And in past inspections of Nationwide's towing office, Parish had seen these rates posted at the front counter—leading him to believe that the company was adhering to the fee schedule.

But soon after suspending Nationwide's permit, Parish received two complaints with concrete allegations of overcharging from earlier in 2017. The first related to a car stolen on February 23, 2017. When Nationwide recovered the car, they presented the owner with a bill of $700 but advised that this fee would be waived if the car was sent to Metrotech Collision for repair.[7] The owner declined the offer and instead paid the $700 to have his car released. The second complaint involved a car stolen on June 19, 2017. Nationwide told the owner that the charges were $750. After waiting a few days, the owner went to pick up the car but got an updated bill for $1,000. When she protested that she could not afford that, the manager let her take the car for $650. In both cases, the quoted fees far exceeded the permissible amounts under the Towing Rules.

For Parish, these complaints confirmed his "fee concerns" about Nationwide. R.211-2, Parish Decl., p.5, PageID 6589. But since Nationwide's DPD permit had been suspended, Parish thought further investigation into the fee problems wasn't a priority, choosing instead to focus on the allegations of criminal collusion. So it was not until February 2018 that he conducted a formal audit of Nationwide's accounts. When DPD finally did audit Nationwide's towing accounts, they found that Nationwide routinely charged excessive fees. Instead of $125 per tow, Nationwide charged $225. Instead of the $75 administrative fee, Nationwide charged $175—of which only $75 was remitted to the City. And instead of $15 per day in storage fees, Nationwide charged $20 per day. Indeed, Nationwide went beyond this blatant inflation of the maximum allowable rates and tacked on hundreds of dollars in additional "gate fees" and "window wrap fees." *Id.* at p.6, PageID 6590.

**B.**

While the DPD's investigation was underway, Nationwide had sued the City for revoking their permit—initiating the current lawsuit. The day after the permit was revoked, Nationwide's

---

[7]Metrotech Collision is a car repair company owned by Sam Hussein, who also has a seventy-five percent ownership interest in Nationwide. Sam's brother, Louay Hussein, operated Nationwide at all relevant times.

counsel reached out to the DPD, noting that they never received "the reasons for this suspension nor an opportunity to be heard *prior* to being deprived of their permit." R.1-6, Deldin Email, p.1–2. In that email, Nationwide's counsel made clear if they didn't receive written notice of suspension, they'd sue. *Id.* at p.2. Having never received a hearing, Nationwide sued just five days after the suspension of the permit. On December 29, 2017, Nationwide and the other plaintiffs filed their Second Amended complaint—the operative complaint—seeking $103,500,000 in damages under 42 U.S.C. § 1983 for alleged deprivations of their due-process rights.

The parties each moved for partial summary judgment. The district court granted Nationwide's partial motion, holding that the towing permit was a property interest and that the lack of a pre- or post-deprivation hearing deprived Nationwide of its due-process rights. After this motion, the parties went through a second round of discovery and briefing on damages. The City then moved for partial summary judgment on damages, arguing that Nationwide was entitled to nominal damages because the permit would still have been terminated even if the City had provided process.

The district court denied the motion, finding that the City had failed to show Nationwide or one of its employees had been involved with car thieves before the July 19, 2017, permit revocation. And yet in reaching this decision, the district court emphasized that the evidence might be enough to support termination at some later point. The court also noted that Nationwide's counsel had stated in a hearing that he didn't "believe the City should be limited to evidence that it knew" as of the date of termination. *Nationwide Recovery, Inc. v. City of Detroit*, No. 17-cv-12378, 2021 WL 1224920, at *3 n.1 (E.D. Mich. Mar. 31, 2021). And so the court ordered a third round of briefing, this time on whether the after-acquired evidence doctrine could limit compensatory damages in procedural due process cases. The district court decided that it would consider admitting the after-acquired evidence to limit Nationwide's compensatory damages.

With this interim decision made, the City again moved for summary judgment on the damages question. In essence, the City argued that even though Nationwide had been denied process, the after-acquired evidence justified their termination and should preclude

compensatory damages. In response, Nationwide argued that the City couldn't show that it would have terminated the permit if a pre- or post-deprivation hearing had occurred. The company also argued that the City couldn't rely on Parish's declaration, which had been attached to their motion, to show how the Board would have responded to the evidence of excessive fees. And it moved to strike the portions of Parish's declaration saying that the Board would have terminated the permit even if there had been a hearing.

The district court granted the City's motion for partial summary judgment and denied Nationwide's motion to strike. Beginning with the motion to strike, the court held that Parish's statements about the probable conduct of the Board came from his "personal experience and knowledge." *Nationwide Recovery, Inc. v. City of Detroit*, No. 17-cv-12378, 2024 WL 1283785, at *2 (E.D. Mich. Mar. 26, 2024). And even though the Board had multiple members, Parish could still "indicate, based on his personal experience and knowledge, what the decision would have been." *Id.*

Next the court addressed damages. In doing so, the court held that "there [was] no genuine issue of material fact that Christian, while working as a Nationwide tower, colluded with car thieves" before the permit's termination.[8] *Id.* at *11. And Nationwide's practice of charging excessive fees in violation of their permit provided an independent reason to limit damages. All this led to the conclusion that Nationwide was only entitled to nominal damages on their due process claim since either (1) the Board would have terminated the permit if a hearing had been conducted, or (2) the evidence of the company's excessive fee collection would cut off the amount of compensatory damages. In short, Nationwide was not entitled to compensatory damages because its conduct justified the termination. So the court entered judgment for Nationwide for one dollar.

---

[8]This holding diverges from the court's March 31, 2021, opinion and order which said that "[o]ne would have to resort to pure speculation—rather than legitimate inference—to conclude that Nationwide or one of its employees took tips from or paid car thieves prior to the July 19, 2017 permit revocation decision." *Nationwide Recovery, Inc. v. City of Detroit*, No. 17-cv-12378, 2021 WL 1224920, at *5 (E.D. Mich. Mar. 31, 2021). But the district court explained that this difference came from its reconsideration of "whether proof of payment" was necessary to show collusion. *Nationwide Recovery, Inc. v. City of Detroit*, No. 17-cv-12378, 2024 WL 1283785, at *10 (E.D. Mich. Mar. 26, 2024). The district court pointed to Parish's testimony emphasizing how "a towing company aids in the concealment of a vehicle's theft and the destruction of potential evidence . . . simply by receiving tips from car thieves regarding the location of stolen vehicles and towing those vehicles without going through the proper DPD channels." *Id.*

Nationwide appealed, challenging both the district court's denial of the motion to strike and its grant of partial summary judgment to the City on the damages issue.

**II.**

We review a district court's denial of a motion to strike for an abuse of discretion. *Blount v. Stanley Eng'g Fastening*, 55 F.4th 504, 515 (6th Cir. 2022) (citing *Ondo v. City of Cleveland*, 795 F.3d 597, 603 (6th Cir. 2015)). Under this "highly deferential" standard, reversal is warranted only if the district court "relies on erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Id.* (quoting *Ondo*, 795 F.3d at 603). And Federal Rule of Civil Procedure 56(c)(4) requires that any declaration supporting a motion for summary judgment "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." So if a declaration fails to meet these requirements, the court retains the power to "issue any . . . appropriate order" to address the deficiency. Fed. R. Civ. P. 56(e).

Personal knowledge is "gained through firsthand observation or experience, as distinguished from a belief based on what someone else has said." *Personal Knowledge*, Black's Law Dictionary (12th ed. 2024). So statements based only on the affiant or declarant's *belief* don't satisfy these requirements and thus cannot be used to support a summary judgment motion. *Ondo*, 795 F.3d at 605; *see also* 10B *Wright & Miller's Federal Practice & Procedure* § 2738 (4th ed. 2016). But still, the district court has the discretion to "differentiate between knowledge and belief" for each part of the document and "should excuse the affiant's [or declarant's] stylistic error" when it decides that a statement stems from personal knowledge. *Ondo*, 795 F.3d at 605. So the inquiry doesn't hinge on the declarant's phrasing. Instead, the court looks to whether the substance of the declarant's statement is supported by personal knowledge and experience.

Nationwide argues that the district court erred by not striking paragraph 12 of Parish's declaration. The relevant paragraph from the declaration states that:

> Nationwide's conduct was both fraudulent and a blatant violation of the [Board's] rules which incorporated the City Council fee schedule. It merited immediate termination. It is my *belief* Nationwide's permit would have been terminated prior to July 19, 2017, had it not misrepresented its activities by publicly posting a conforming fee schedule that alleged it was charging proper rates.

R.211-2, Parish Decl., pp.5–6, PageID 6590–91 (emphasis added). Specifically, Nationwide contends that Parish's use of "belief" alone disqualifies the paragraph from consideration because it violates the personal knowledge requirement of Rule 56(c)(4). But even without the word "belief," Nationwide argues that Parish couldn't have opined on what the Board would have done since he lacked personal knowledge about how any of its eleven members would have voted. And finally, the company points to the word "fraudulent" and the statement that Nationwide's conduct was "a blatant violation of the [Board's] rules" to argue that Parish was offering a conclusion of law or ultimate fact.

On the first point, that the declaration uses the word "belief" isn't dispositive on whether the statement was, in fact, made with personal knowledge. The district court can—and should—excuse a "stylistic error" when a declarant's basis for making a statement is his personal knowledge. *Ondo*, 795 F.3d at 605; 10B *Wright & Miller* § 2783 n.30. Here, the district court did just that by reviewing the record and deciding that the City had established Parish's "personal experience and knowledge" as it related to the statements in this paragraph. *Nationwide Recovery, Inc.*, 2024 WL 1283785, at *2.

As to the second point, even though the Board consisted of eleven members, this fact doesn't make Parish's testimony conjectural. Again, the district court pointed to the City's record evidence, which showed that Parish's role as the supervisor of the DPD towing program had familiarized him with the Board's approach to permits. And the record suggests that Parish often worked with the Board on towing-related issues and that his statement was based on those interactions.[9]   *See, e.g.*, R.217-3, Parish Dep., p.181, PageID 7226 (emphasizing that his

---

[9]Nationwide points to the out-of-circuit case *Nagel v. United Food*, 63 F.4th 730 (8th Cir. 2023), for the proposition that predictions of how others would have voted can't be "based on personal knowledge and [are]

statement in the declaration was based on his personal involvement with the Board's "past terminations" of towing permits); R.223-2, Suppl. Parish Decl., at p. 7, PageID 7686 (noting that his opinion was "[b]ased on [his] years of experience with DPD towing and the [Board], which includes many interactions with the [Board] on towing and other issues").

The personal-knowledge requirement is not a high bar and "merely requires that an affiant's [or declarant's] statements be grounded in observation or other first-hand experience." *Turner v. Long*, No. 23-5685, 2024 WL 3029249, at *6 (6th Cir. June 17, 2024) (citing *United States v. Hickey*, 917 F.2d 901, 904 (6th Cir. 1990)). And so the record evidence here is sufficient to show that Parish's statements were based on personal knowledge.

Nationwide resists that conclusion, arguing that "without an actual vote" on termination or testimony from the Board members on how they would have voted, Parish's statement "is inherently speculative." Reply Br. at 9. The company proposes a blanket rule that the City shouldn't be able to "establish facts as to how third parties would decide an issue" through opinion testimony. *Id.* at 11–12. But Rule 56(c)(4)'s requirement of personal knowledge doesn't exclude all opinion testimony in declarations. When the opinion testimony is "based upon the personal and rational perceptions" of the declarant, that opinion may be admissible to the extent "that it is well founded on personal knowledge and susceptible to specific cross-examination." *See Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 846 (6th Cir. 2015) (quoting *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 240 (6th Cir. 2010)). And here, Parish's statements were based on his own personal knowledge of the Board's operations.

Nationwide's final objection suggests that Parish's statement that the company's conduct was "fraudulent" was an impermissible legal conclusion. *See* R.211-2, Parish Decl., p.5, PageID 6590. But context shows that this sentence is a statement of fact or lay opinion based on his experience. Even if it were an impermissible legal conclusion, the district court could disregard

---

inadmissible for summary judgment purposes." Appellant Br. at 37. But *Nagel* confronted the radically different situation in which the plaintiffs argued that thirteen union members would have voted against a revised collective bargaining agreement. There, the main problem with the plaintiffs' declarations was not that they sought to "predict how *others* would have voted" but that "[n]one appear[ed] to be based on 'personal knowledge.'" *Nagel*, 63 F.4th at 735 (quoting Fed. R. Civ. P. 56(c)(4)). So *Nagel* doesn't hold that a declarant can never testify about how someone else might vote. Instead, it emphasizes Rule 56(c)(4)'s requirement that such testimony must be supported by the declarant's personal knowledge.

this "extraneous material." *F.R.C. Int'l, Inc. v. United States*, 278 F.3d 641, 643–44 (6th Cir. 2002) (quoting *A.L. Pickens Co. v. Youngstown Sheet & Tube Co.*, 650 F.2d 118, 121 (6th Cir. 1981)).  And so the appropriate remedy would've been to strike that sentence, not the entire paragraph.  As a result, the district court did not abuse its discretion in refusing Nationwide's motion to strike the entire paragraph.

## III.

We review the district court's grant of summary judgment de novo.  *Walden v. Gen. Elec. Int'l*, 119 F.4th 1049, 1056 (6th Cir. 2024).  Under 42 U.S.C. § 1983, a plaintiff has a cause of action against any person who, under color of state law, deprives them "of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  And they can recover legal damages "to compensate for the injury caused by the constitutional deprivation." *Parrish v. Johnson*, 800 F.2d 600, 608 (6th Cir. 1986); *accord Farrar v. Hobby*, 506 U.S. 103, 112 (1992).

As to the recovery of damages for violations of procedural due process, we look to the Supreme Court's decision in *Carey v. Piphus*, 435 U.S. 247 (1978).  Piphus, a high school student, was suspended without a hearing after the school principal allegedly saw him smoking marijuana. *Id.* at 248–49.  He sued the school under § 1983 alleging a deprivation of due process in violation of the Fourteenth Amendment. *Id.* at 250–51.  And the district court held that the school had deprived Piphus of procedural due process by not providing a pre-suspension hearing but declined to award compensatory damages. *Id.* at 251–52.  Disagreeing, the court of appeals determined that even if the suspension were justified, the deprivation of due process could support a compensatory-damages award without any showing of injury by Piphus. *Id.* at 252–53.

The Supreme Court reversed, finding that compensatory damages can't be presumed for every deprivation of procedural due process. *Id.* at 263.  The Court explained, "it is not reasonable to assume that every departure from procedural due process, no matter what the circumstances or how minor" will result in an injury requiring compensatory damages. *Id.* Instead, "procedural due process rules are shaped by the risk of error inherent in the truthfinding process." *Id.* at 259 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 344 (1976)).  The Court

defined procedural due process as an "absolute" right because it doesn't depend on "the merits of a claimant's substantive assertions." *Id.* at 266. Indeed, procedural due process rights can be deprived even when the complained-of conduct isn't shown to have caused actual injury. *Id.*

After *Carey*, we articulated a two-step inquiry to determine how compensatory damages should be awarded for violations of procedural due process. The inquiry looks to causation and proof of actual injury. First, the court must answer "whether the action taken without due process [wa]s justified or, in other words, whether the same action would have been taken even if due process had been afforded." *Franklin v. Aycock*, 795 F.2d 1253, 1263 (6th Cir. 1986). And if the plaintiff makes that showing, the court must then ask whether "there is proof of actual injury . . . to support an award of compensatory damages." *Id.* If the inquiry shows that the deprivation of process was the only injury suffered by the plaintiff, the appropriate remedy is nominal damages. *See Carey*, 435 U.S. at 266–67.

The first part of this framework asks us to engage with a counterfactual: Would the deprivation of life, liberty, or property have still occurred even if there had been due process? But before we can answer this question, we must decide what evidence we can consider. Nationwide insists that we can't rely on evidence that the City didn't have at the time of termination. Doing so, it claims, would create "a perverse incentive" for governments to excuse procedural due process failures with post hoc rationalizations. Appellant Br. at 22.

But this misstates the purpose of a post-termination or post-deprivation hearing. That hearing is not focused on whether the choice to terminate was correct *at the time of the initial termination*. Instead, its goal is to determine whether the continued termination is justified by all the evidence before the Board at the time of the hearing—i.e., before the government "finally deprives a person of his property interests." *Parratt v. Taylor*, 451 U.S. 527, 540 (1981), *rev'd on other grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986); *accord Moody v. Mich. Gaming Control Bd.*, 790 F.3d 669, 677 (6th Cir. 2015). After all, newly uncovered information isn't always supportive of final termination. And just as we wouldn't demand that the Board ignore exculpatory information undermining a final termination, we don't expect them to disregard inculpatory information supporting final termination.

An example illustrates this point.  In *FDIC v. Mallen*, the FDIC suspended Mallen from his position as director of a federally insured bank because he had been criminally indicted for crimes of dishonesty and breach of trust that might impair public confidence in the bank.  486 U.S. 230, 236–37 (1988).  Because of some procedural irregularities, Mallen's pre-deprivation hearings never concluded—leaving the FDIC's order unsupported by any process other than its own internal decisionmaking.  *See id.* at 238 & n.8.  He was given a post-deprivation hearing, which he argued was inadequate because his criminal trial could have concluded before he received a hearing with the FDIC and cleared his name.  But the Court rejected this argument, noting that if Mallen had been acquitted "the basis for the suspension would have disappeared and the order would have been vacated." *Id.* at 245–46.  By the same token, a later "conviction merely strengthens the case for maintaining the suspension."  *Id.* at 246.  Post-termination evidence is a two-way street; it can either support or detract from the case for final deprivation.  And so a post-deprivation hearing must consider this evidence.

As a result, we see no need to adopt Nationwide's cribbed view of the justification inquiry in procedural due process cases.  We respect the rules of procedural due process not just for their own sake but for what they defend.  These "rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Carey*, 435 U.S. at 259.  And the inquiry into whether a deprivation was justified need not be artificially limited to what the City could prove on the date of termination.  Such a standard would hinge on how adept a company is at hiding its misdeeds rather than an earnest consideration of whether the procedural error harmed the plaintiff.

Indeed, the essence of the inquiry here requires considering evidence that the City didn't have access to as of the termination date.  This is because of how fast a termination can happen.  The Towing Rules allow the City to "immediately terminate" any towing permit for fraud or criminal conduct if the Board gives the permit-holder a hearing as "soon as practicable" to determine whether to affirm or rescind the termination.  R.41-9, Towing Rules, p.11, PageID 1553.  The Board wasn't required to conduct a pre-deprivation hearing to terminate a permit based on fraud or criminal conduct if it provided an adequate post-deprivation hearing as soon as was practicable.  When there are credible allegations of fraud or criminal activity by a towing

company or its employees, it is unlikely that the City would allow that company to retain its position of authority while waiting for the hearing—especially if there is a risk that the tower's criminal actions might continue to harm the City or its citizens.

After all, it is the failure to provide this post-deprivation hearing—not the termination itself—that Nationwide is challenging here. *See Zinermon v. Burch*, 494 U.S. 113, 126 (1990) ("The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process."). And Parish stated that any post-deprivation hearing wouldn't have occurred until several months after the July 19 termination. So, importantly, any evidence of wrongdoing that surfaced during that time would have been available at that hearing. And in conducting the hearing, the Board would have no reason to artificially limit its review to the complaints that gave rise to the termination—especially if more evidence of criminality or fraud had emerged.[10] For the same reason, we see no reason to limit our inquiry to the evidence in the City's possession on July 19, 2017. Doing so would give Nationwide an advantage it wouldn't have enjoyed if the hearing had occurred. And so we review all evidence that the Board would have considered if it had conducted a hearing on Nationwide's permit.

We need look no further than the evidence that at least one of Nationwide's drivers colluded with known criminals to recover stolen vehicles. Christian first started receiving tips from a known car thief in early July. During his police interview, Christian claimed that he normally recovered "two or three" stolen cars a week while working twelve-hour shifts. R.211-2, Christian Interview, p.5, PageID 6636. But Nationwide's own records showed that in July 2017, he recovered 55 stolen cars, which is more like 13 cars a week. And Parish testified that "it would be almost impossible for one tow truck driver to recover" that many vehicles "without assistance from the thieves." R.211-2, Parish Decl., p.10, PageID 6595.

---

[10]We note that Nationwide's counsel wholeheartedly agreed with this conclusion—at least at first. In a motion hearing on this exact issue, counsel expressed that the City should be able to use evidence relevant to the termination "even if it was found three months after or four months after." R.243, Mot. Hr'g Tr., p.15, PageID 8200. And when asked to "flesh out" his client's position, Nationwide's attorney doubled down, explaining that he didn't "think it would be a workable constitutional standard to limit the City . . . to only the facts that it knew at the time of the hearing because it can have suspicions that turn out to be proven by evidence that existed at the time of the decision." *Id.* at pp.15, 18, PageID 8200, 8203. After all, individuals shouldn't "be rewarded for concealing evidence." *Id.* at p.16, PageID 8201.

And yet more facts would've been available to support the termination decision at a post-termination hearing.  Parish received complaints about Nationwide's excessive fees before July 2017, along with two complaint memos sent to him by another officer on July 26, 2017.  These facts were available no later than seven days after the July 19 permit termination.  Had a post-termination hearing been conducted, this evidence would have been presented to the Board and, on its own, would have constituted grounds for termination as blatant violations of the Towing Rules.

Based on this record, we agree with the district court that there is no genuine issue of fact that Christian, while working for Nationwide, colluded with car thieves.  This evidence of Christian's criminality and overcharging would have been presented if the Board had conducted a timely hearing and would have been sufficient grounds to terminate Nationwide's permit.  All this is not to deny that the City fell short of its obligation to provide Nationwide the process it was due under the Constitution.  But still, Nationwide's conduct justified the termination, meaning that the City's "failure to accord procedural due process could not properly be viewed as the cause" of any loss that the company suffered.  *Carey*, 435 U.S. at 260.  So Nationwide is only "entitled to recover nominal damages not to exceed one dollar."  *Id.* at 267.

**IV.**

For these reasons, we affirm.